524 A.2d 86

**McLEAN, KOEHLER, SPARKS & HAMMOND**

**v.**

**Howard A. SCHNEPFE et al.**

**No. 102, Sept. Term, 1986.**

Court of Appeals of Maryland.

April 22, 1987.

William B. Dulany (Dulany, Parker & Scott, on brief), Westminster, for appellant.

John H. Zink III (Cynthia M. Hahn and Cook, Howard, Downes & Tracy, on brief), Towson, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

RODOWSKY, Judge.

This appeal in general involves the problem of unfunded retirement benefits. In particular it involves the interpretation of the terms, "any unpaid or accrued expenses," as used in the voluntary withdrawal provisions of a partnership agreement between certified public accountants. The parties disagree over the applicability of the quoted terms to unfunded obligations to pay, monthly, determinable amounts to retired former partners for ten years after retirement. The trial court, sitting nonjury, concluded that those obligations to retired partners were not "expenses" under the agreement. Before the appeal was heard by the Court of Special Appeals, we granted certiorari on our own motion. For reasons set forth below, we shall affirm.

Appellant and defendant below, McLean, Koehler, Sparks & Hammond (the Firm), adopted a written partnership agreement on October 1, 1979.[1] Howard A. Schnepfe (Schnepfe) became a partner in the Firm on January 1, 1980.[2] On December 31, 1984, Schnepfe voluntarily withdrew from the Firm. On that same date another partner retired. The Firm's statement of changes in financial position as of December 31, 1984, reported that payments

---

**1.** The agreement contains a continuation provision by which "[t]he addition, retirement, withdrawal or removal of any parties to this agreement at any time during its life shall not dissolve or terminate this partnership or create a new partnership in any way." A. Bromberg, *Crane & Bromberg on Partnership*, at 419 (1968) points out that where the partnership agreement contains a continuation provision "the principal consequence of dissolution [namely, forced liquidation] is properly avoided, [so that] it makes little sense to say there is a dissolution, especially where the agreement says there is not. On the other hand, little harm results other than the waste of a concept." [Footnote omitted.] Thus, we shall use "Firm" without regard to changes in the number or identity of the persons who continued to carry on the practice of accountancy under the same name.

**2.** The plaintiffs in the action below were both Howard A. Schnepfe, individually, and Howard A. Schnepfe, P.A. An addendum of January 1, 1983, to the partnership agreement states the professional corporation is the partner in the Firm. In this opinion the term "Schnepfe" refers either to the individual or to the professional corporation, as appropriate to the context.

required to be made to retired partners during calendar 1985 would be $68,245, an increase of $28,395 over the figure reported in the balance sheet as of December 31, 1983, for retirement payments to be made during calendar 1984. The Firm's December 31, 1984, balance sheet also reported $344,209 as the "Long-Term Retirement Liability."[3] As of the date of Schnepfe's withdrawal from partnership the Firm's current (1985) and long-term retirement liability totaled $412,454 on the balance sheet. In accounting to Schnepfe the Firm set off against the amount payable to Schnepfe his partnership percentage of that total retirement liability. Schnepfe, disputing that the set off was authorized under the agreement, brought the instant action.

The partnership agreement of October 1, 1979, was prepared within the Firm by a committee of three partners, including Terry W. Weller (Weller), who has been chairman of the Firm's management committee since 1980. The contract's format uses catch words or headings in the margin next to each numbered paragraph. Five paragraphs are particularly relevant to the arguments of the parties. Paragraph 10, "EXPENSES," reads:

All expenses, debts, losses or deficiencies which shall be incurred in carrying on the said practice of accountancy shall be paid out of the funds of the partnership. In case of any deficiency thereof, such deficiency shall be paid by

---

**3.** A footnote to the balance sheet further explains the item, as follows:
Long-Term Retirement Liability
The partnership agreement provides for retirement payments to partners calculated as specified in the agreement. Any such liability becomes fixed upon the partners reaching age 65 if other requirements are met as stated in the agreement.
The liability included in the financial statements represents the net present value (discounted at 6%) of the balance to be paid by the partnership. The accrued retirement liability is payable in monthly installments ranging from $1,150 to $2,380 over a period of 3—10 years. The annual payments required for each of the next five years are as follows: $68,245—1985 through 1987; $63,808—1988 and $56,933—1989.

the partners in the proportion in which they are entitled to share in the net profits of the partnership.

Paragraph 12, "<u>BOOKS OF ACCOUNT</u>," states:

The books of account will be maintained on a cash basis and all tax returns will be prepared on the same basis.

Paragraph 14, dealing with "<u>RETIREMENT</u>," in relevant part reads:

[T]he retiring partner shall be entitled to receive the following:

(a) ... the balance in the retiring partner's capital account....

(b) An annual retirement or death benefit, payable monthly, computed as follows:

(i) The sum of an amount computed as follows: $1\frac{1}{4}\%$ of the retiring partner's average total earnings credited to his capital account for the four year period during which such earnings are the highest multiplied by the lesser of his full years of accredited service to the firm or 25; and

(ii) There shall be added to the amount computed under (i) above 1% of the average total earnings credited to his capital account referred to above multiplied by his full years of service in excess of 25; but in no event will the maximum aggregate annual retirement benefit exceed 40% of said average total earnings.

Paragraph 16 states that the retirement payments "will be for a period of ten (10) years to the retired partner or, in the case of death, to his spouse or estate."

"<u>VOLUNTARY WITHDRAWAL</u>" is the subject of ¶ 18 which in relevant part reads:

Upon voluntary withdrawal of a partner, he shall surrender his interest in the partnership and be entitled to the following:

(a) The balance in the withdrawing partner's capital account....

(b) His percentage of accounts receivable on the books at the date of his withdrawal which are collected within two

years of the date of such withdrawal reduced by his percentage of the recorded value of work in process of clients taken by the withdrawing partner *and any unpaid or accrued expenses as of such date.* The amounts to be paid under this paragraph shall be paid within thirty days after the end of the fiscal quarter in which such collections occur. Before any moneys are paid to the withdrawing partner pursuant to this paragraph, such withdrawing partner shall make satisfactory arrangements to pay any moneys owing by him to either the partnership or to any other partner or partners. Until all such debts to the partnership or other partners are fully paid, the partnership shall have the right to apply all payments due against such debts without further authorization from the withdrawing partner. Should the obligation for work in process exceed the partner's share of accounts receivable, that amount shall be reimbursed to the partnership. [Emphasis added.]

The Firm says, and Schnepfe denies, that the $412,454 liability to retired partners as of December 31, 1984, is an "unpaid or accrued expense[ ]." At that time Schnepfe had a 10.5% interest in the Firm. Applying, or not applying, that percentage to the retirement liability produces a "swing" of $43,307.67. Under the Firm's interpretation Schnepfe would owe the Firm money. The trial court, adopting Schnepfe's position, entered judgment in his favor for $36,742.[4]

---

4. The money judgment entered March 31, 1986, did not adjudicate Schnepfe's claim for breach of contract in its entirety. At that time the full payout on accounts receivable for all of calendar 1986 was unknown. Schnepfe's complaint, however, included a claim for a declaratory judgment on the interpretation dispute. He asked the circuit court to determine the amount of the Firm's expenses, within the meaning of ¶ 18 of the partnership agreement, as of December 31, 1984. The trial court included its declaration of the amount of those expenses in the March 31, 1986, judgment and then certified the judgment under Maryland Rule 2–602(b). As a result the claim for declaratory judgment has been adjudicated in its entirety and the judgment is appealable.

Schnepfe testified that an "[a]ccrued expense is an expired cost for which you have not received or normally will not receive an invoice." In reference to the requirement for "books of account [to] be maintained on a cash basis," Schnepfe explained that "to have expenses recorded [they] must be paid," while under the accrual method "expenses are recorded whether paid or unpaid." Schnepfe introduced into evidence the Firm's computer generated report of income and expense for the month and the eleven months ending November 30, 1984. "[R]etirement expense" is listed under the general category "other expenses." The amount actually paid in November to retired partners was $3,320.90 and the year to date amount paid to retired partners was $36,529.90. Turning to the December 31, 1984, balance sheet and related statements Schnepfe explained that the payments made in 1984 to retired partners were included in the category "other expenses" on the statement of income and partners' capital. On the balance sheet, the statement of current and long-term liability for retired partners was presented on an accrual basis.

Counsel for Schnepfe read into the record from the deposition of Weller who acknowledged that the expenses referred to in ¶¶ 10 and 18 of the partnership agreement are the same.

Weller, testifying in the Firm's case, said that the requirement for cash basis accounting in ¶ 10 of the partnership agreement was only for tax purposes and that accountants generally accept using an accrual basis for stating the true financial position of an account. Weller said the retirement obligation was an unpaid or accrued expense as of the date of Schnepfe's withdrawal because the obligation had been carried on the accrual basis balance sheet.

There had been one prior instance of the withdrawal of a partner under the 1979 Firm agreement, that of Thomas Jess Crouch (Crouch) who withdrew June 30, 1984. Minutes of a Firm meeting of September 4, 1984, reflect that Weller reviewed at that meeting "the Crouch Settlement Proposal dated August 30, 1984" and that "[t]he partners

approved the proposed settlement which shows that Mr. Crouch should settle with [the Firm] for a payment to us of $815.00." The Firm also introduced through Weller a single page tabulation headed, "Second Revision—Crouch Settlement Proposal—October 18, 1984," on which appears a computation following the steps of ¶ 18 of the partnership agreement. The exhibit uses Crouch's percentage of $400,-000 of "[r]etirement liability" to compute a deduction from accounts receivable. The exhibit as typed and as revised by $68 in handwriting reflected a balance to Crouch of $3,064.

The circumstances of Crouch's withdrawal from the Firm are also described in portions of Weller's deposition read into evidence by Schnepfe's counsel.

Question: As I understand it you, Mr. Weller, were authorized by the partnership to negotiate a financial settlement with Mr. Crouch including an immediate lump sum payment as opposed to the stretched out accounting if you will of the collection of accounts receivable, isn't that correct? Answer: No, that is predicated on Crouch's desire to handle it by withdrawal in that manner. Question: He wanted a deposit payment and have it done with, is that correct? Answer: That is correct. Question: And that was a negotiated settlement? Answer: Effectively, yes.

Crouch testified in the Firm's case. He "was aware that on the accrual basis financial statements [he] had seen during [his] association with the firm that that number [representing retirement liability] was there." Crouch further testified, "I believe the treatment of the liability as an accrued expense was consistent with the treatment of that amount." By a November 6, 1984, letter from Weller for the Firm and countersigned by Crouch on November 26, 1984, the latter accepted $3,064 "in settlement of [his] withdrawal from the partnership effective June 30, 1984."

In their respective legal positions here and in the trial court Schnepfe essentially emphasized "expenses" while the Firm emphasized "accrued." Schnepfe contends that the only accrued expenses are those payable, but not yet paid,

as of December 31, 1984. Schnepfe concedes that the amount of his percentage of accounts receivable was properly reduced by the amount of his percentage in those accounts payable as of December 31, 1984, which the court found to have been "incurred in carrying on the said practice of accountancy[.]" (Partnership Agreement, ¶ 10). The Firm submits that the payments to be made to retired partners are liquidated amounts which were fixed as to liability on December 31, 1984, and which, even in the event of the death of a retired partner, must be made to the retired partner's estate or spouse.

The trial court, looking at the agreement's language from the viewpoint of the Firm, ruled that it was "at best" ambiguous. The court in effect said "accrued" meant payable as of December 31, 1984. But the court went on to say that a retirement benefit payment "is not the ordinary type of accounting expense that is referred to in paragraph 10 and Mr. Weller admitted on Deposition an expense in 10 and 18 are the same." The trial judge explained that he was "limiting the retirement liability on the basis principally it is not an expense as defined in paragraph 10[.]"

"Accrued expense" in ¶ 18 is indeed ambiguous from the Firm's standpoint in that we cannot say that the quoted words necessarily include liability to retired partners as reflected on the balance sheet. E. Faris, *Accounting for Lawyers*, at 39 (rev. ed. 1964) summarizes the concept of expense with the following excerpt:

"Expense in its broadest sense includes all *expired costs which are deductible from revenues. . . .* The narrower use of the term expense refers (only) to such items as operating, selling or administrative expenses, interest, and taxes.

*     *     *     *     *     *

"While the term expense is useful in its broad and generic sense in discussions of transactions and as a general caption in income statements, its use in financial statements is often appropriately limited to the narrower

sense of the term. [Bold type omitted; emphasis added. Quoting the American Institute of Certified Public Accountants Committee on Terminology, *Accounting Terminology Bulletins Nos. 2 and 4 (reprinted in Accounting Research and Terminology Bulletins* (final ed. 1961)).]

The meaning of "accrued" was addressed in *Dryden v. Baltimore Trust Co.*, 157 Md. 559, 146 A. 752 (1929) in the context of a statute which excluded from the estate tax income accrued after the decedent's death. We observed:

> The words "accrue," "accrued" and "accruing," in their generally received sense, are used of something which is to be added or attached to something else. In the past tense the word "accrued" is commonly used in the sense of "due and payable." [*Id.* at 564, 146 A. at 754.]

*Clark v. Seidel*, 25 Md.App. 139, 333 A.2d 355 (1975), speaking of a note which provided that "interest ... shall accrue during any such period of moratorium or other action," stated: "We can conclude only that the word 'accrue' has no fixed meaning and that what it means in any use depends upon the context and the intent." *Id.* at 143, 333 A.2d at 358.

1A C.J.S. at 134, speaking of the verb "to accrue," and its parts, "accrued" and "accruing," says that

> the word, as used in the law, has two meanings; in other words that it is often applied to a present enforceable demand, and that as often, if not more often, it means simply to arise or come into existence.

> The meaning of the word is dependent somewhat on the facts of each case and the objects to be accomplished either by the statute or contract in which the word is used. [Footnotes omitted.]

■ It was therefore appropriate for the trial judge to look to the evidence bearing on the intention of the parties. *See Pacific Indemnity Co. v. Interstate Fire & Casualty*, 302 Md. 383, 389, 488 A.2d 486, 489 (1985); *Truck Insurance Exchange v. Mark Rentals, Inc.*, 288 Md. 428, 433, 418

A.2d 1187, 1190 (1980); *Rice v. Rice*, 246 Md. 212, 216, 227 A.2d 742, 744 (1967). Weller had equated the meaning of "expenses" in ¶ 18 with ¶ 10. The latter states that "[a]ll expenses, debts, losses or deficiencies which shall be incurred in carrying on the said practice of accountancy shall be paid out of the funds of the partnership." We read the trial judge's oral opinion to have found that the ¶ 10 "expenses" relate to ordinary operating expenses, as contrasted with ¶ 10 "debts." In the ¶ 10 context the latter term carries the connotation of a present obligation to pay at a more remote time in the future than expenses would be paid. "Debts" and not "expenses" is more characteristic of the liability for retirement payments. Accordingly, there is no error in the judgment below.

■ The Firm, nevertheless, argues that Schnepfe is legally bound by the interpretation of the partnership agreement utilized in the Crouch settlement. The trial judge, however, was not required to accept the evidence concerning the Crouch settlement as definitive on the interpretation issue.

Minutes of a November 15, 1984, meeting of the Firm, which Schnepfe attended, recite that "Mr. Weller distributed a letter to Jess Crouch which spelled out the financial terms of settlement in detail." The record contains only the November 6, 1984, letter from the Firm to Crouch. That letter does not recite enclosure of the second revised proposal of October 18, 1984. The October 18 tabulation is not directly referred to in the minutes. In any event, Schnepfe testified that Weller handled the settlement with Crouch.

It is clear from the entire record that the trier of fact gave little weight to the evidence concerning the Crouch settlement. In a veritable barrage of comments from the bench during the trial the judge said:

What Crouch thought about that doesn't make any difference in what I think about them.

. . . .

[The set of minutes] doesn't show that Mr. Schnepfe approved of anything. It does indicate the Minutes show he registered no objection. I think that's different.

. . . .

He [Crouch] is here. I guess you can call him. All right. Go ahead. Frankly, I don't think it makes any difference.

. . . .

How would that [the Crouch settlement] affect this man [Schnepfe]?

. . . .

I don't think that's an estoppel against Schnepfe [referring to there being no objection registered in the minutes by Schnepfe to the Crouch settlement].... Nor is there any waiver.

The interpretation of an ambiguous contract becomes a question of fact. We cannot say that the trial judge was clearly erroneous in declining to accord controlling weight to the evidence concerning the Crouch settlement.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.