73 A.3d 224

DUMBARTON IMPROVEMENT ASSOCIATION, INC., et al.

v.

DRUID RIDGE CEMETERY COMPANY, et al.

No. 128, Sept. Term, 2010.

Court of Appeals of Maryland.

Aug. 22, 2013.

Michael R. McCann (Michael R. McCann, P.A., Towson, MD), on brief, for Petitioner.

John R. Fischel (Robert S. Brennen of Miles & Stockbridge, P.C., Baltimore, MD; Jennifer Ryan Lazenby and Dino C. La Fiandra of Whiteford, Taylor & Preston, LLP, Towson, MD), on brief, for Respondent.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BELL * and MURPHY,** JJ.

BELL, C.J.

## I.

In August, 1999, Druid Ridge Cemetery Company, one of the respondents ("Druid Ridge"), entered into a contract to sell 36.21 acres (the "Development Parcel") of the approximately 200 acres [1] that it owns and are a part of its cemetery

---

\* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

\*\* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court, but did not participate in the decision or adoption of this opinion.

1. The respondents characterize the property at issue as "approximately 209 acres of land in the Pikesville area of Baltimore County, consisting of one parcel of approximately 173 acres on which it operates a cemetery known as Druid Ridge Cemetery ... and a second parcel of approximately 36 undeveloped acres (the "Development Parcel") that is contiguous with but separated from the larger parcel by the Western Run Stream and a forest buffer." The parties do not dispute that this parcel of property, whether 200 acres or 209 acres, is the property conveyed to the Cemetery in 1913 and was at issue in *Gregory v. Chapman*, 119 Md. 495, 87 A. 523 (1913). In that case, the Court referred to the cemetery property as consisting of 200 acres. *Id.* at 497, 87 A. 523. As we will see, *infra*, the insolvency court, in its opinion,

operation in Baltimore County. The purpose for which the intended purchaser, Druid Ridge, LLP, the other respondent, entered into the contract was to construct fifty-six semi-detached residences on portions of the land that are immediately adjacent to Park Heights Avenue. The proposed sale has been challenged by the petitioners, the Dumbarton Improvement and Long Meadow Neighborhood Associations, which represent residents from the other side of Park Heights Avenue, individual residents of these neighborhoods, and seven owners of burial lots in the Druid Ridge Cemetery. They brought an action in the Circuit Court for Baltimore County seeking, *inter alia,* a declaration that the residential development violated restrictive covenants contained in the deed conveying the cemetery property to Druid Ridge.

The present challenge, initiated on November 1, 2006, is premised on the restrictive covenant contained in the 1913 deed conveying the property to Druid Ridge. Arguing that the covenant burdened the land then and still does, the petitioners maintain that the proposed sale violates the covenant and should not be permitted to proceed. On May 9, 2008, the Circuit Court for Baltimore County determined that the language of the restrictive covenant was ambiguous and that, even if the language were unambiguous, there were radically changed circumstances in the area that rendered the restrictive covenant ineffective and unenforceable. On September 29, 2010, the Court of Special Appeals affirmed this judgment by the Circuit Court. *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.,* 195 Md.App. 53, 57, 5 A.3d 1133, 1135 (2010). Because we conclude that the language of the restrictive covenant is unambiguous, and, further, that the nexus between the changed circumstances and the purpose of the covenant offered by the respondents is not sufficient to render the restrictive covenant unenforceable, we shall reverse.

---

also referred to the cemetery property as consisting of "200 acres, more or less."

**44**

## II.

The Druid Ridge Cemetery of Baltimore County (the "Cemetery") was incorporated on January 14, 1896. The Cemetery acquired, on the same day, 200 acres from Charles Tyler, the corporation's largest shareholder, *see Gregory*, 119 Md. at 497–98, 87 A. at 523, to create a modern burial setting, unique for both its size and park-like appearance.[2] Because Maryland law, at that time, prohibited cemeteries from holding more than 100 acres, following the organization of the Cemetery, the Maryland General Assembly promulgated Acts of 1900, Chapter 537, which authorized the corporation to "take, hold and use" 200 acres "for the purpose of burial." The Cemetery was also at the vanguard of a movement to make park-like cemeteries. *See For Burial Reform*, New York Mail and Express, June 7, 1898.

The Cemetery fell into insolvency in 1910, just twelve years after it commenced operations in 1898, largely due to its unsustainable business model, and was placed into receivership. *Gregory*, 119 Md. at 499–500, 87 A. at 524. As of 1911, approximately 134 of the Cemetery's 200 acres were not being used for burial plots or cemetery lawns. *Dumbarton Improvement Ass'n*, 195 Md.App. at 59–60, 5 A.3d at 1137. On May 1, 1911, court-appointed receivers reported that the best way to protect the interest of creditors and to provide for the perpetual care of lots already sold was to sell all the property of the corporation, unencumbered by the accrued debt, to a purchaser willing to continue the Cemetery as an ongoing concern. *Gregory*, 119 Md. at 501, 87 A. at 525. In response, some creditors told the court that their interests would best be protected by permitting the property to be used to meet varied interests.

On March 21, 1912, the insolvency court adopted the recommendation of the receivers. It found:

---

**2.** The 1897 Deed conveying the property to Druid Ridge Cemetery Company of Baltimore County did not restrict the use of the property.

" ... that the land of the corporations *consisting of about 200 acres,* more or less, and all personal property *should by the Receivers be sold as and for a cemetery* upon such terms as the Receivers in the[ir] discretion shall deem most advantageous, discharged and free from the operation and effect of the 10,000 land shares mentioned in the said Agreement of January 14, 1896 or any other lien or obligation of the said corporation, except that the purchaser will be required to set apart and invest out of the purchase price the sum of $40, 000 to provide for the perpetual care of the lots already sold and to covenant to set apart a sufficient sum from lots by the purchaser thereafter sold to invest for the permanent maintenance thereof."

*Dumbarton Improvement Ass'n,* 195 Md.App. at 60, 5 A.3d at 1137 (emphasis included). In its decree, the court ordered:

"That all the unsold land of the corporation ... be sold [by the receivers] ... and that the course and manner of their proceedings shall be as follows: ... They shall then make said sale of said unsold lots and improvements in which the use of lots for burial purposes has not been sold.... Said receivers shall offer all said unsold land described in the deed *as a whole ....* *Said property shall be offered for sale by said receivers as a cemetery, to be maintained and operated as such,* subject to the proviso that the purchaser or purchasers thereof shall covenant and agree, in the deed to be executed to such purchaser or purchasers of said property ... to hold and invest [$40,000] for the perpetual care thereof and of said cemetery grounds, and shall also in said deed covenant and agree to set apart, invest and hold, such portion of the proceeds of the sale of lots hereafter to be sold in said Cemetery as may be necessary to provide for the perpetual maintenance and care of said lots so hereafter to be sold.

"[T]he said Receivers shall, by a good and sufficient deed, ... *so as to contain[ ]the covenants aforesaid,* convey [the Cemetery] to the purchaser or purchasers subject also [to] the obligations of the purchaser or purchasers of said

property *to provide for the perpetual care of lots and of said cemetery grounds* as hereinbefore set forth."

The receivers reported that the court's condition requiring the land to be used as a cemetery was not being favorably received by potential buyers. *Dumbarton Improvement Ass'n,* 195 Md.App. at 60, 5 A.3d at 1137. As a result, the insolvency court amended its order by striking the condition that the property be operated as a cemetery, thus "reserving for [its] future determination the question how much, if any, of said property shall be required to be maintained as a cemetery." *Id.* at 61, 5 A.3d at 1137.

On August 8, 1912, the receivers accepted an offer to purchase the property of the Cemetery for $205,000, subject to the exact conditions that had been set forth in the insolvency court's initial order and decree. *Gregory,* 119 Md. at 502, 87 A. at 525. On March 17, 1913, a deed that transferred 200 acres from the receivers to the Druid Ridge Cemetery Company was executed. The deed provided, in relevant part:

"[Sellers], do hereby grant and convey unto [buyers], *its successors and assigns, subject to the terms, conditions, and covenants hereinafter set out, all that tract or parcel of land* . . . described as follows:

"Beginning for the same at a stone heretofore planted at the end of a South 40 degrees west 48 1/8 perch line of the land conveyed by Samuel Owings and Cornelius Howard to George Reinicker on August 11, 1813. . . .

"Being the same land which by Deed dated January 14, 1896 . . . was granted and conveyed by Charles Tyler and wife to said Druid Ridge Cemetery of Baltimore County.

. . .

"*To have and to hold said tract or parcel of land and premises above described* and mentioned together with the rights, privileges, appurtenances and advantages thereto belonging or appertaining. . . .

"*Subject, however, to the following covenants* and conditions which the said Druid Ridge Cemetery Company for itself,

its successors and assigns, does hereby covenant and agree to perform:

"1. *That the said property be maintained and operated as a cemetery.*

"2. That the said Druid Ridge Cemetery Company, its successors and assigns, shall invest and hold subject to the orders of this Circuit Court, the sum of $40,000 of the purchase money as a fund with the income of which to meet and comply with any and all obligations heretofore assumed by said Druid Ridge Cemetery or said receivers, with the purchasers of lots sold therein, for the perpetual care thereof, and of said Cemetery grounds.

"3. That the said Druid Ridge Cemetery Company, its successors and assigns, does hereby covenant and agree to invest and hold such portion of the proceeds of lots hereafter sold in said Cemetery as may be necessary to provide for like perpetual maintenance and care of lots in said Cemetery hereafter to be sold."

(emphasis added).

Since the execution of the 1913 Deed, the real property of the Druid Ridge Cemetery has remained largely unchanged. Between 1921 and 1989, six smaller-than-one-acre parcels of the Cemetery were sold to nearby residents, businesses, and utility companies. The construction of Interstate 695 led to a shifting of property boundaries unrelated to the parcel under dispute in the present case. In 1995, Druid Ridge Cemetery sought and received a special exemption that would permit it to use the Development Parcel for burials.

The petitioners argue that the first restrictive covenant in the 1913 Deed is clear and unambiguous because the language, "said property," unequivocally refers to the property being transferred by the deed. They note that the Circuit Court decision did not identify or describe any ambiguity in the language when it determined that the restrictive covenant was ambiguous as to the extent of the covenant's intended enforceability. The petitioners also highlight the language of the

other restrictive covenants contained in the deed to argue that the "said property," burdened by the first restrictive covenant, encompasses more than the respondents propose, the area on which burial lots had been sold and used and lawns developed, in either 1913 or today. The petitioners maintain that it would be nonsensical to restrict the covenants in the 1913 Deed to the property that was improved with grave sites (and lawns) in 1913 because that would imply a lack of intention to protect future grave-sites, something that the deed's reference to, and provision for, at the court's insistence, the perpetual care of present and future grave-sites belie. The petitioners further contend that the extrinsic evidence, were it appropriate, would support their reading of the covenant because its 200–acre scope was constantly reaffirmed throughout the insolvency proceedings.

The petitioners contend that the conveyance of small tracts of land from the original property after 1913, the potential negligible impact of residential development on areas improved with burial plots, and the general availability of burial plots in other portions of the Cemetery are all irrelevant to determining the intent of the restrictive covenant. Likewise, the petitioners argue, differences in the relative value of the property under different uses fail to illuminate the intent of the covenant. Although there have been changes since 1913, the petitioners argue that the changes are irrelevant because they were consistent with transitions already underway when the property was conveyed by deed, and further, that there was no sufficient connection between the changes and the continued viability of the covenant. The petitioners further argue that whether the Development Parcel will ever be used for grave-sites is an inappropriate consideration, because such a consideration grants the covenantor "the power to unilaterally defeat a covenant to which he or she has agreed to be bound." *City of Bowie v. MIE Properties, Inc.*, 398 Md. 657, 687, 922 A.2d 509, 527 (2007).

The respondents urge that the lack of reverter language and the mention of express beneficiaries in the deed support their position that the use of the property is not restricted.

They argue that their absence suggests that the contested language in the deed functioned more as an expression of confidence than as a restrictive covenant. Even if it constituted a restrictive covenant, the respondents argue that the intent of the parties was ambiguous because a reasonable person could infer more than one possible understanding of the nature and extent of the restriction from the express language of the covenant. First, they concede that the covenant's language leaves little doubt that cemetery operations must occur on "said property," but, the respondents claim, it does not dictate how much of "said property" must be reserved for cemetery purposes or for how long. Then, the respondents contend that the petitioners must insert the adjective, "entire," to the reference to "said property" in the covenant to render the covenant's meaning unambiguous.

The respondents assert that the use of 40 acres as farmland when the covenant was included in the deed, subsequent sales of Cemetery property for non-cemetery use (including the sale, only eight years after the restrictive covenant was imposed, of 0.8 acres to a party to the insolvency proceedings), and non-cemetery uses of the Development Parcel after the 1913 deed burdening the property with the covenant [3] demonstrate that there was no intent to burden the entire property, only that then being used as a cemetery. They submit that this is borne out by the extrinsic evidence. That evidence establishes, the respondents argue, that the intention of the parties to the 1913 deed was to burden the deeded land only insofar as was necessary to guarantee the Cemetery as an ongoing concern, provide for the perpetual care of the graves and lawns, and resolve the insolvency proceedings in an orderly manner. [4]

---

**3.** Stressing that the Development Parcel has never been used for burials, the respondent details the various uses to which it has been put: 1) a nursery; 2) a trash dump; 3) a bus turnaround; and 4) a staging area for the Department of Public Works' vehicles.

**4.** The respondents also argue that the petitioners waived the argument that the covenant was unambiguous by failing to raise that point in

The respondents argue, alternatively, that, even if the 1913 Deed contained an unambiguous restrictive covenant, circumstances have radically changed since the covenant was imposed on the property and those changed circumstances have rendered the restrictive covenant ineffective. The respondents highlight the growing population of Pikesville and of Baltimore County, the increasing commercial density, and rising land values for residential use, as compared to cemetery use, in nearby Pikesville and throughout Baltimore County. The respondents also presented expert testimony that demonstrated how changes in the death-care industry have increased the number of bodies able to be buried per acre and decreased the demand for burial lots; they argue that these changes make it highly unlikely that the Development Parcel will be needed for burials within the next century. The respondents finally note the significant changes in land-use regulation, especially wetland regulation, that it maintains will make it far more difficult to use the Development Parcel as a cemetery today than it would have been in 1913.

Following adverse decisions by the Circuit Court for Baltimore County and the Court of Special Appeals, the petitioners filed in this Court a petition for issuance of the writ of certiorari, presenting six questions for review.[5] We granted

---

their post-trial memorandum. We granted certiorari to address, *inter alia, infra* note 5, the clarity of the covenant. The respondents did not cross appeal. As such, it is our opinion that the respondents, rather, have not preserved the issue of the petitioner's waiver.

5. The questions presented for review are, as follows:
"1. Is a restrictive covenant in a deed that requires, in plain and simple terms, that the cemetery property be 'maintained and operated as a cemetery' unambiguous and enforceable as written?
"2. Did the Circuit Court err in its review of extrinsic evidence and finding from that evidence that the restrictive covenant was only intended to apply to the already developed portions of the cemetery and the then existing lot owners?
"3. Did Appellees fail to meet their burden of demonstrating not only that a radical or dramatic change in circumstances occurred since the restrictive covenant was first imposed but also that the purpose of the covenant would no longer be served by its enforcement?

the petition, *Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 417 Md. 500, 10 A.3d 1180 (2011), but believe that the case can best be resolved by answering just two questions:

 1. Is the first restrictive covenant created by the 1913 Deed ambiguous?

 2. Have radically changed circumstances made enforcement of the first restrictive covenant ineffective for achieving the purpose of said covenant?

## III.

 Our jurisprudence on contract interpretation is well settled and oft-stated. As is the case with statutory interpretation, "[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions." *Tomran, Inc. v. Passano*, 391 Md. 1, 14, 891 A.2d 336, 344 (2006) (citing *Owens–Illinois, Inc. v. Cook*, 386 Md. 468, 497, 872 A.2d 969, 985 (2005)). Courts in Maryland apply the law of objective contract interpretation, which provides that "[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368, 137 A.2d 687, 693 (1958). *See also Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166–67, 829 A.2d 540, 546 (2003); *Long v. State*, 371 Md. 72, 84, 807 A.2d 1, 8 (2002). As such, "[a] contract's unambig-

---

"4. Did the Circuit Court err in finding a sufficient change in circumstances when the uncontroverted evidence demonstrated that those changes were already occurring, and anticipated to continue, at the time the covenant was first imposed?

"5. Did the Circuit Court violate the standard set forth in *City of Bowie v. MIE Properties, Inc.*, 398 Md. 657 [922 A.2d 509] (2007) by considering the likelihood of the proposed development parcel ever being used for gravesites?

"6. Are principles of macro-economics, and concern for achieving the most productive and beneficial use of property, relevant considerations when determining the enforceability of a restrictive covenant?"

uous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution." *Sy–Lene of Washington,* 376 Md. at 167, 829 A.2d at 546. Instead, "[i]f a written contract is susceptible of a clear, unambiguous and definite understanding . . . its construction is for the court to determine." *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 251, 768 A.2d 620, 630 (2001) (quoting *Rothman v. Silver,* 245 Md. 292, 296, 226 A.2d 308, 310 (1967)). Our task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement, but rather, to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985). Additionally, the principles of contract interpretation require that "in ascertaining the true meaning of a contract . . . [,] the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 167, 198 A.2d 277, 283 (1964). *See also Tomran, Inc.,* 391 Md. at 13–14, 891 A.2d at 344; *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993).

 Likewise, covenants, a species of contracts, are to be enforced according to the objective intent of the original parties. *See Live Stock Co. v. Rendering Co.,* 179 Md. 117, 122, 17 A.2d 130, 133 (1941) ("It is a cardinal principle . . . that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself."); *MIE Properties, Inc.,* 398 Md. at 682 n. 13, 922 A.2d at 524 n. 13 ("Restrictive covenants . . . are a species of contract. Thus, they are interpreted in a like manner as other types of contracts."); *see also Anne Arundel Cnty. v. Crofton Corp.,* 286 Md. 666, 673, 410 A.2d 228, 232 (1980) ("[A] court, in construing agreement, must first determine from the language

of the agreement itself, what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated.").

■ The language of the restrictive covenant is the first source to which we must look in an effort to uncover the intent of the covenanting parties; if the language of the covenant is unambiguous, it is the only source to which we look, except to confirm the plain meaning of the covenant. *Shillman v. Hobstetter*, 249 Md. 678, 688, 241 A.2d 570, 576 (1968) ("In determining the intention of the parties, the language of the instrument is the primary source for that determination."); *see also Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md.App. 636, 654, 46 A.3d 473, 484 (2012) (quoting *Volcjak v. Washington County Hosp. Ass'n*, 124 Md.App. 481, 509, 723 A.2d 463, 477 (1999)) ("The primary source for determining whether the parties intended a third party to have standing to enforce the contractual provisions is the language of the contract itself."). Indeed, we have stated that "[w]here the language of the instrument containing a restrictive covenant is unambiguous, a court should simply give effect to that language 'unless prevented from doing so by public policy or some established principle of law.'" *SDC 214, LLC, v. London Towne Prop. Owners Ass'n*, 395 Md. 424, 434, 910 A.2d 1064, 1069 (2006) (quoting *Miller v. Bay City Prop. Owners Ass'n*, 393 Md. 620, 636, 903 A.2d 938, 948 (2006)); *accord Belleview Constr. Co. v. Rugby Hall Cmty. Ass'n*, 321 Md. 152, 158, 582 A.2d 493, 496 (1990).

■ As with contracts generally, a covenant is ambiguous if its language is susceptible to multiple interpretations by a reasonable person. *See Calomiris v. Woods*, 353 Md. 425, 435–36, 727 A.2d 358, 363 (1999) (citing *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 596, 578 A.2d 1202, 1208 (1990); *Truck Ins. Exch. v. Marks Rentals*, 288 Md. 428, 433, 418 A.2d 1187, 1190 (1980)). "An ambiguity does not exist simply because a strained or conjectural construction can be given to a word." *Belleview*, 321 Md. at 159, 582 A.2d at 496. The first step is to "[d]etermine from the language of the

agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated," and if "the language of the contract is plain and unambiguous there is no room for construction" *Calomiris*, 353 Md. at 436, 727 A.2d at 363.

"Extrinsic evidence is only utilized when the intent of the parties and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question, necessitating a reasonable interpretation of the language in light of the circumstances surrounding its adoption." *MIE*, 398 Md. at 681, 922 A.2d at 523–24 (citing *SDC 214, LLC*, 395 Md. at 434–36, 910 A.2d at 1070–71 (refusing to employ the rule of reasonable construction [6] when the restrictive covenant was clear and unambiguous and applying the plain language of the covenant); *Miller*, 393 Md. at 634–35, 637, 903 A.2d at 946–48 (outlining the evolution of the reasonable construction rule and foregoing its application in construing a covenant because the "words used [were] clear and unambiguous")).

The respondents primarily rely upon the Circuit Court's decision, affirmed by the Court of Special Appeals, to argue "[t]hat the said property be maintained and operated as a cemetery" is ambiguous. After determining that language in

---

**6.** The rule of reasonable construction, or the "reasonably strict construction" rule, *County Commissioners v. St. Charles*, 366 Md. 426, 447, 784 A.2d 545, 557 (2001), provides that

"[i]f the meaning of [an] instrument is not clear from its terms, the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources."

*SDC 214, LLC*, 395 Md. at 434, 910 A.2d at 1070 (quoting *Belleview*, 321 Md. at 157–58, 582 A.2d at 493, 495). Conversely,

" '[i]f an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement.' "

*SDC 214, LLC*, 395 Md. at 434, 910 A.2d at 1070 (quoting *Belleview*, 321 Md. at 158, 582 A.2d at 495). *See also MIE*, 398 Md. at 681, 922 A.2d at 523; *Miller*, 393 Md. at 634–35, 903 A.2d at 946–7.

the 1913 Deed constituted a restrictive covenant, the Circuit Court addressed the question of ambiguity, stating:

"The next step in the analysis is to determine whether the covenant is unambiguous. If it is, it must be enforced in accordance with its terms, thereby restricting the use of the Development Parcel for any purpose other than a cemetery. If it is ambiguous, then the intent of the parties must be determined.

"Having reviewed the language in the 1913 Deed, I find it to be ambiguous. It is unclear the extent to which the 'said property' is to be maintained and operated as a cemetery. Clearly at the time it was sold, large portions of the nearly 200 acre parcel were not used as a cemetery, and nearly 100 years later, that remains true. While it is clear that use of at least some portion as a cemetery was contemplated, the extent and nature of that use, as required by the Deed, is ambiguous."

The interpretation of a covenant involves both the discovery of facts and the application of legal rules. Although this Court will only overturn a trial court's findings of fact when the findings are clearly erroneous, Maryland Rule 8–131(c),[7] whether a covenant's language is ambiguous is an issue of law, which this Court reviews de novo. *See United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 79, 899 A.2d 819, 833 (2006); *MIE,* 398 Md. at 682, 922 A.2d at 524; *Sy–Lene of Washington,* 376 Md. at 163, 829 A.2d at 544; *see also Chestnut Real Estate Partnership v. Huber,* 148 Md.App. 190, 201, 811 A.2d 389, 396 (2002). Additionally, this Court recently noted in *MIE,* "the interpretation of a restrictive covenant, including a determination of its continuing vitality, is subject to de novo review as a legal question." 398 Md. at 677, 922

---

7. Maryland Rule 8–131(c) provides:

"When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."

A.2d at 521 (citing *Huber,* 148 Md.App. at 201, 811 A.2d at 395–96 (2002)).

The Circuit Court wrote that enforcing the restrictive covenant in the 1913 Deed "in accordance with its terms" required "restricting the use of the Development Parcel for any purpose other than a cemetery"; as a matter of law, its analysis of the covenant's ambiguity should have ended there. If the terms of a covenant require a particular outcome, then it is impossible to meet the legal threshold for ambiguity, which requires that the language of a covenant be susceptible to multiple interpretations by a reasonable person. *See Calomiris,* 353 Md. at 435–36, 727 A.2d at 363.

The Circuit Court did not stop there, however. Instead, it proceeded to conclude that the covenant in the 1913 Deed was ambiguous, but without highlighting a particular word or any of its language that could be construed differently by a reasonable person. In fact, the Circuit Court, having opined that the extent of the restriction was unclear, relied on extrinsic evidence to infer the subjective intent of the parties, wholly independent of the language. This analysis is fundamentally flawed for two reasons. First, as we made clear in *MIE,* an ambiguity in *the actual language* used by the parties should be identified before consulting and introducing extrinsic evidence. *See* 398 Md. at 681, 922 A.2d at 523–24. Second, once an ambiguity in the language has been identified, extrinsic evidence should be used only to resolve that ambiguity. *See Calomiris,* 353 Md. at 447, 727 A.2d at 369 ("even if the language were ambiguous, parol evidence would be admissible only to resolve the ambiguities and not to contradict unambiguous terms"); *see also Belleview,* 321 Md. at 158, 582 A.2d at 495 (using extrinsic evidence to clarify the meaning of the word "lots" as found in the covenant).

The Court of Special Appeals affirmed the Circuit Court's decision because a "reasonable reading of the covenant would have been that the requirement to use the property to maintain and operate a cemetery did not extend to every square foot of the nearly 200 acres." *Dumbarton Improvement*

*Ass'n,* 195 Md.App. at 70–71, 5 A.3d at 1143 (2010). The intermediate appellate court noted that the covenant did not expressly require that all of the property be "solely or exclusively" used for a cemetery and that there was no time limit on the covenant. *Id.* The Court of Special Appeals also, as we have noted, emphasized the lack of reverter language in the covenant, the covenant's lack of clarity as to duration, and the failure of the covenant to address who may enforce the covenant in the event of violations of the covenants. *Id.* Like the Circuit Court, the Court of Special Appeals failed to identify any ambiguous language, in particular, in the covenant as written.

 As a preliminary matter, a covenant need not address every conceivable issue or potential outcome to avoid being ambiguous; it need only provide a clear answer for the matter in dispute. The question before us does not concern the consequences of violating the covenant, so the potential ambiguity of the covenant due to a lack of reverter language is of no consequence. *See, e.g., Calomiris,* 353 Md. at 441, 727 A.2d at 365–66 (holding that there must be a nexus between "the alleged ambiguities" and "the contract language necessary to resolve [the] dispute"). Nor does the lack of a specific time frame render the language of a covenant ambiguous. Although the ongoing validity of the covenant, nearly a century following its creation, is an issue in this case, this Court has previously held that "where the duration of a restrictive covenant has not been expressly limited, it will be implied that some reasonable limitation adapted to the nature of the case was intended." *Norris v. Williams,* 189 Md. 73, 77, 54 A.2d 331, 333 (1947) (citing *Whitmarsh v. Richmond,* 179 Md. 523, 529, 20 A.2d 161, 164 (1941); *Gulf Oil Corp. v. Levy,* 181 Md. 488, 494, 30 A.2d 740, 743 (1943)). Determining the reasonable time limit is very similar to the analysis of changed circumstances, *see, e.g., Norris,* 189 Md. at 77, 54 A.2d at 333, which we shall take up below. It is clear, however, that the lack of an express time frame does not make a covenant, as a whole, ambiguous.

**58**

The Court of Special Appeals correctly cited *SDC 214, LLC* for the proposition that it would be improper to insert "solely or exclusively" (or, we add, "partially") to the covenant to avoid an ambiguity as " 'it is not the province of this Court to supply a missing' word or phrase in a restrictive covenant." 395 Md. at 437, 910 A.2d at 1071 (quoting *Sowers v. Holy Nativity Church,* 149 Md. 434, 442, 131 A. 785, 788 (1926)). Nevertheless, the intermediate appellate court's analysis of the covenant's ambiguity is flawed.

The language of the restrictive covenant contained in the 1913 Deed is clear and unambiguous. After describing all 200 acres, both in its precisely surveyed relationship to the neighboring property and its full publicly recorded history, as a distinct parcel of land, the deed makes the conveyance of this property to the Druid Ridge Cemetery Company subject to the conditions "[t]hat the said property be maintained and operated as a cemetery" and that steps be taken to insure that exiting grave-sites and future ones, lots to be sold in the future for burial, be perpetually maintained. What is encompassed in "the said property" is only ambiguous if the language in the habendum clause of the 1913 Deed, which precisely sets forth the extent of the property burdened, is ignored. And, of course, consistent with the rules of contract construction, the meaning of that phrase must be determined from the deed as a whole, not by viewing the covenant in isolation. *Md. Agric. Land Pres. Found. v. Claggett,* 412 Md. 45, 63, 985 A.2d 565, 576 (2009); *St. Charles Assocs.,* 366 Md. at 463, 784 A.2d at 566–67 (noting that rules of construction require that a court consider the deed in question as a whole); *Chevy Chase Land Co. v. United States,* 355 Md. 110, 123, 733 A.2d 1055, 1062 (1999) (concluding that a reviewing court "must consider the deed as a whole, viewing its language in light of the facts and circumstances of the transaction at issue as well as the governing law at the time of conveyance").

Furthermore, no evidence has been proffered to explain why the language, "maintained and operated as a cemetery," is susceptible to more than one reasonable interpretation. Even when the use of extrinsic evidence is appropriate, it

should first be directed at resolving the ambiguity in the language, *MIE,* 398 Md. at 681, 922 A.2d at 523, and the clarified language should, in turn, be used to ascertain intent. In the present case, if the phrase, "the said property," is ambiguous for not being precise as to the scope of the burden it imposed on the cemetery property, reference to another part of the deed, the habendum clause, resolves the ambiguity and the deed, considered as a whole, makes clear that the intent of the restrictive covenant was to burden the entire property, all 200 acres, with the restrictive covenant.

Uncovering the intent of an ambiguous covenant involves findings of facts, to be sure. *MIE,* 398 Md. at 683 n. 16, 922 A.2d at 525 n. 16 (citing *McLean, Koehler, Sparks & Hammond v. Schnepfe,* 309 Md. 399, 410, 524 A.2d 86, 91 (1987); *Shapiro v. Massengill,* 105 Md.App. 743, 754–55, 661 A.2d 202, 208 (1995)). We will not overturn a trial court's factual determinations unless there is clear error. See *Jones v. State,* 343 Md. 448, 460, 682 A.2d 248, 254 (1996) ("[A]bsent clear error in its fact-finding, an appellate court is required, in deference to the trial court, to accept those findings of fact."). Such an error is present here. Although there was no clear error in the Circuit Court's fact-finding methodology, that methodology was directed at answering the wrong question. In the case of covenant interpretation, like that of other contracts, extrinsic evidence should answer the question: how would a reasonable person have understood the covenant language at the time it was made? *See Calomiris,* 353 Md. at 441, 727 A.2d at 366 (noting that "extrinsic evidence admitted must help interpret the ambiguous language and not be used to contradict other, unambiguous language").

The argument made by the respondents and adopted by the Circuit Court to explain the intent of the parties to the 1913 Deed focuses upon the use of portions of the land for activities other than maintaining and operating a cemetery at the time the deed was conveyed and afterwards. The respondents, in that regard, point to the facts that, beginning 8 years after the 1913 deed, in 1921, and continuing until as late as

1989, the Cemetery has conveyed parcels of the Cemetery property to other parties for non-cemetery uses and those parties have so used the property conveyed.[8] This evidence does little to resolve the case sub *judice*. It simply may demonstrate that the covenant has been violated on several occasions.[9] At best, it illuminates the subjective aspirations of one of the parties to the deed. As we noted earlier, however, this Court employs an objective standard for interpreting covenants, and this evidence does little to explain how a reasonable person would have understood the covenant's language at the time it was written.

There is evidence that directly addresses how the language of the restrictive covenant would have been understood by a reasonable person when it was created. As noted above, the 1913 Deed was drafted to comply with an insolvency court order. Although the final version of the court's order did not require that the property be maintained and operated as a cemetery, the initial version did. It mandated that: "[s]aid property shall be offered . . . as a cemetery, to be maintained and operated as such." In suggesting the removal of this requirement from the earlier version of the order, the receivers, in relevant part, informed the court:

> "Your Receivers have since had numerous inquiries from prospective purchasers, and they find that much objection has been made to those features of the decree which requires that the purchaser shall covenant to use the property

---

**8.** The transactions include the conveyance of: .8 acres for a single family dwelling; a 185 foot strip for "a siding for the purposes of the standing of trolley cars"; .6 acres for an office building and an additional .843 acre ground rent lease for parking associated with the building; .4 acres for a bank branch office; and a 4200 square foot perpetual drainage and utility easement. The conveyance for the dwelling house was signed by two signatories of the 1913 deed, which, to the respondents, is clear evidence that the restrictive covenant was never intended to be applicable to 100% of the property.

**9.** We note that a burdened party cannot waive an obligation through noncompliance, *MIE*, 398 Md. at 697–98, 922 A.2d at 533–34, and there is no evidence that the petitioners waived the enforcement of the covenant or are in privity with any party that may have done so.

as a Cemetery.... Criticism has been made that it will not be necessary or desirable to use the whole 189 [10] acres as a cemetery, but that a considerable part of it can be much better used for other purposes, without injury to the Cemetery property."

In response to the receiver's report, the insolvency court altered its earlier order:

"[B]y striking out ... the requirement that said property shall be offered ... as a Cemetery, to be maintained and operated as such ... the Court reserving for future determination the question how much, if any, of said property shall be required to be maintained as a cemetery."

(Order of the Circuit Court for Baltimore County in the matter of *Baker v. Druid Ridge Cemetery,* 4/19/1912 E.1694–95). In order to preserve the question of how much of the land would be maintained and operated as a cemetery, the judge was compelled to remove language that is nearly identical to that found in the 1913 Deed.[11] The evidence suggests that, in addition to the court, both the receivers and the potential purchasers in 1912 understood the removed language to prevent non-cemetery use of the entire property.

The only obvious dispute regarding the language of the covenant in the 1913 Deed in the 1912 proceedings concerned whether placing this restriction on the land was a sensible business decision. As we noted in *MIE,* however, this Court will "not invalidate a plainly written covenant to save a party from what may prove to be a poor business decision." 398 Md. at 683, 922 A.2d at 525 (citing *Higgins v. Barnes,* 310 Md. 532, 540, 530 A.2d 724, 728 (1987)); *see also Miller,* 393 Md. at 638, 903 A.2d at 948.

---

**10.** According to a newspaper advertisement for the sale of the cemetery property, announcing the public auction to be held on May 15, 1912, 11 1/4 acres of the 200 acres had been sold as burial sites.

**11.** Compare "[s]aid property shall be offered ... as a cemetery, to be maintained and operated as such" from the initial order in 1912 with "the said property be maintained and operated as a cemetery."

The question of how the language would have been understood at the moment that an ambiguous covenant was made ordinarily is best addressed by the trial court. It is unnecessary to undertake that analysis in the present case, however. We determine, as a matter of law, that the covenant, as written, clearly and unambiguously "restrict[s] the use of the Development Parcel for any purpose other than a cemetery."

## IV.

The respondents, as indicated, alternatively argue that even if the restrictive covenant is unambiguous, and was meant to preclude the use of any portion of the original 200 acres for any activity other than maintaining and operating a cemetery, it should, nonetheless, no longer be enforced. As we discussed in *MIE*, "[t]he proper legal standard for this inquiry is to examine whether, after the passage of a reasonable period of time, the continuing validity of the covenant cannot further the purpose for which it was formed in light of changed relevant circumstances." 398 Md. at 685, 922 A.2d at 526; *see also Texas Co. v. Harker*, 212 Md. 188, 198, 129 A.2d 384, 390 (1957) ("Most jurisdictions now recognize a change in the character of a neighborhood as a ground for affirmative relief against restrictive covenants … where the change has been so radical as … to defeat the object or purpose of the restriction."). "The inquiry, therefore, is whether there has been a complete or radical change in the neighborhood causing the restrictions to outlive their usefulness." *Chevy Chase Village v. Jaggers*, 261 Md. 309, 316, 275 A.2d 167, 171 (1971).

As we stated in *MIE*, "we begin our analysis of whether the Covenants in this case remain valid and enforceable with an examination of the Covenants' purpose as indicated by their actual language." 398 Md. at 681–2, 922 A.2d at 524 (citing *SDC 214, LLC*, 395 Md. at 433, 910 A.2d at 1069; *Miller*, 393 Md. at 637, 903 A.2d at 948; *Belleview*, 321 Md. at 157, 582 A.2d at 495). The respondents contend that the sole purpose of the covenant was to allow "time for the Cemetery Company to become a continuous and successful cemetery

operation able to provide for the 'maintenance and care of the graves and attendant structures.'" The petitioners, on the other hand, argue that the purpose of the covenant was to prevent non-cemetery uses of the Cemetery and thus insulate the entire 200 acres from outside influences. The Circuit Court, agreeing with the respondents, found that the purpose of the covenant was "to require continued operation of the existing cemetery, and to provide for perpetual care of the grounds and grave." The Court of Special Appeals affirmed this finding after determining that it was not clearly erroneous. *Dumbarton Improvement Ass'n,* 195 Md.App. at 71, 5 A.3d at 1144.

A circuit court's finding of purpose is generally not disturbed in the absence of clear error. *MIE,* 398 Md. at 684, 922 A.2d at 525 ("We do not second-guess the Circuit Court's evaluation of the Covenants' purpose given the trial court's unique position to weigh the credibility of the evidence and testimony adduced at trial"). We find clear error here because the Circuit Court's determination of intent proceeds directly from its incorrect determination that the covenant was ambiguous. It was this erroneous determination that prompted the inappropriate use of extrinsic evidence by the Circuit Court to assess the intent of the parties. As we noted above, the language of the covenant is clear and unambiguous. Where this is the case, it is in the plain language of the covenant that the parties' intentions are found. Accordingly, we agree with the petitioners, that the purpose of the covenant was to ensure that the full 200 acres be reserved for cemetery uses.

The next step in the analysis is to determine if there have been relevant radical changes such that the covenant cannot achieve the purpose for which it was created. In that regard, the respondents contend that there have been numerous radical changes in the neighborhood that prevent the covenant from furthering the purpose for which it was formed. The changes to the area identified by the respondents can be grouped into three kinds or sets: (1) the change from agrarian and rural to residential, suburban, and commercial in the

Cemetery's immediate vicinity between 1913 and today; (2) the development of superior, alternate means of fulfilling the Cemetery's fiduciary duties; and (3) increased regulation of land-use.

Both the Circuit Court and the Court of Special Appeals relied upon these changes to find that the covenants, even if they initially prevented the sale of the Development Parcel, were no longer enforceable. The petitioners do not deny that much has changed in the vicinity of the Cemetery. They argue, however, that some changes were anticipated in 1913, and that none of the changes frustrates the purpose of the covenant. We address each set of changes in turn.

There is no nexus between the demographic and economic changes presented by the respondents and the purpose of the covenant as revealed by its express language. The respondents presented evidence that tended to show a dramatic increase in the population of Pikesville in particular and Baltimore County in general. They also used aerial photographs to show that what was once a largely agrarian and sparsely populated area is now a densely populated commercial hub. The respondents also noted the current use of the Cemetery as a shortcut between area arterial roads. The petitioners counter these assertions with evidence that many of the changes described by the respondents were already underway in 1913.

This Court previously has determined that otherwise valid residential-use restrictions are no longer enforceable because of the changing character of the neighborhood. *See, e.g., Whitmarsh,* 179 Md. at 529, 20 A.2d at 164 (holding a restriction to only use property for residential purposes unenforceable because the surrounding neighborhood had transformed into a commercial district); *Talles v. Rifman,* 189 Md. 10, 17, 53 A.2d 396, 398–99 (1947) (holding that a restriction, which required detached housing on a block, was unenforceable because each of the surrounding blocks were composed of row houses). The primary difficulty with applying the holdings from these cases to the present issue is that the changed

circumstances noted by the respondents are targeted at a misreading of the covenant's purpose.

The respondents' evidence was introduced to counter the petitioner's argument that the purpose of the covenant was to create a tranquil preserve.[12] That, however was not the purpose of the covenant. We have already determined that the purpose of the covenant, reflected in and by its plain language, is to preserve 200 acres for the maintenance and operation of a cemetery. A perpetual preserve of repose and tranquility is, or may be, an ancillary effect of this purpose, but it is not the proper metric for determining the ongoing viability of the covenant. The respondents failed to explain how the changing character of the neighborhood frustrated the potential use of the entire 200 acres as a cemetery in any way, and there is no obvious reason why these changes would do so.

Furthermore, even if the purpose of the covenant was to preserve a space of tranquility, the present case, involving a 200–acre property, is distinguishable from the cases where we held that a change in neighborhood conditions rendered a covenant unenforceable. In those cases we were confronted with a requirement that only a single house be placed on a lot in a neighborhood where all the other lots had multiple dwellings, *see Whitmarsh,* 179 Md. at 524–26, 20 A.2d at 162, or a restriction against the construction of a row house on a block surrounded by row houses. *See Talles,* 189 Md. at 12–14, 53 A.2d at 396. The purpose of these covenants was to preserve a particular type of neighborhood, a purpose that simply could not be achieved by restricting a single lot or block in the midst of other lots or blocks not similarly restricted. The present case is not at all analogous; the preservation

---

12. The respondents also presented evidence to suggest that tranquil space would not have been a major concern for the parties to the 1913 Deed as the Cemetery was located in a sparsely populated area. The petitioners argued that the covenant could be seen as a bulwark against the changes that could have been reasonably anticipated in 1913. We do not resolve this factual question here as we have already held that the covenant is clear and unambiguous.

of a 200–acre cemetery does not require that the surrounding area also be similarly restricted.

The respondents also contend that changes in the death-care industry, land value, and the Cemetery's financial status mean that continued enforcement of the covenant no longer serves any purpose. To that end, the respondents presented evidence that there has been an increase in the number of burials permitted per acre and a decrease in the proportion of people selecting burials, as compared to cremations, since the restriction was placed in the 1913 Deed. The respondents claim that, as a result of these changes, there is at least a century's worth of space for burial plots in the portion of the Cemetery that does not include the contested Development Parcel. The respondents also presented evidence that the demand for residential land had increased dramatically, and, as a result, retaining the land for cemetery use in the distant future was no longer a socially efficient or desirable outcome. Additionally, the respondents note that the Cemetery is no longer in danger of insolvency, explaining, further, that the sale of the Development Parcel will be a financial benefit to the Cemetery Company, rather than the financial detriment that could potentially arise from the cost of property taxes for, and maintenance of, the Development Parcel.

These changes were presented as evidence that the restriction on the property now frustrated the covenant's purpose of ensuring that the Cemetery remain an ongoing, financially stable operation that could provide for the perpetual care of graves and grounds already purchased. We note again, this is not the purpose of the covenant as expressed in the plain and unambiguous language of the covenant, and there is no direct connection between the changes presented here and the ability to maintain and operate a cemetery on the 200 acres transferred in the 1913 Deed. Accepting, *arguendo*, the respondents' characterization of the covenant's purpose, their changed circumstance argument, which was accepted by the Circuit Court, and affirmed by the intermediate appellate court, is, nonetheless, legally flawed.

In *MIE,* where we stated that: "The proper legal standard for this inquiry is to examine whether, after the passage of a reasonable period of time, the continuing validity of the covenant cannot further the purpose for which it was formed in light of changed relevant circumstances," 398 Md. at 685, 922 A.2d at 526, we explicitly rejected the standard that assessed the effects of changes by "determin[ing] whether there is a reasonable probability that the parties will be able to achieve the goals of the Covenants within a reasonable period of time." *Id.*

The respondents do not contend that the Cemetery is presently or will eminently be unable to provide for the perpetual care of grounds and graves currently in existence unless they are permitted to sell Cemetery grounds, as were the facts in *Columbia Bldg. Co. v. Cemetery of the Holy Cross,* 155 Md. 221, 225, 141 A. 525, 526 (1928) ("plaintiff has been and is in need of money for cleaning up the cemetery ground . . . the sale of said land will provide the funds necessary"). The respondents in this case simply contend that they would be in a better position to care for graves and grounds if they were allowed to sell the Development Parcel. Ensuring the best fiscal outcome is not the test for the ongoing validity of a covenant. *See Harker,* 212 Md. at 200–01, 129 A.2d at 391 (finding economic benefits insufficient to invalidate restrictions on a particular lot). Moreover, considering the ongoing financial stability of the Druid Ridge Cemetery Company, there has been no showing that the Cemetery cannot continue at its current size.

The sale of the Development Parcel may make better business sense for the respondents, but, as we noted in the discussion of ambiguity, this Court will "not invalidate a plainly written covenant to save a party from what may prove to be a poor business decision." *MIE,* 398 Md. at 683, 922 A.2d at 525 (citing *Higgins v. Barnes,* 310 Md. 532, 540, 530 A.2d 724, 728 (1987)). Furthermore, we note that the decision to defer the use of the 36.21 acres constituting the Development Parcel until after all of the other Cemetery grounds have been used is a business decision. Although it may be a very

sensible one, Druid Ridge Cemetery Company's decision not to use the land for burials in the foreseeable future does not bear upon the question of whether the Development Parcel can be used as a cemetery within a reasonable period.

The most persuasive of the respondents' arguments, given the purpose of the covenant as identified in the language, is that increased regulation of land use, especially of wetlands, has made it impractical to use the Development Parcel as a cemetery. In support of this argument, the respondents presented evidence that it would cost approximately one million dollars, following an extended permitting process, to access the Development Parcel for the purposes of burial. The Circuit Court determined that petitioners unsuccessfully contested the foundation for the respondents' claims, and we find no clear error in the Circuit Court's finding of fact in that regard. Nevertheless, these facts do not reach the standard set forth in *MIE*. *See* 398 Md. at 685, 922 A.2d at 526. Although the high costs and difficult permitting process may lead the Cemetery company to want to develop the Cemetery property in other ways and for different purposes, the respondents need to demonstrate that they *cannot* procure a permit or that they *cannot* recuperate the costs of bridging the wetlands while fulfilling obligations that arise from the restrictive covenants burdening the property.

We hold that the first restrictive covenant in the 1913 Deed, clearly and unambiguously, requires that all 200 acres sold to the Druid Ridge Cemetery Company be maintained and operated as a cemetery. Although we agree that there have been significant changes in the vicinity of the Cemetery, we also hold that none of these changes frustrate the covenant's ability to achieve the purpose expressed in its language or affect its ongoing validity. For these reasons we reverse the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THIS CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR EN-**

TRY OF JUDGMENT IN FAVOR OF THE PETITION-
ERS. COSTS IN THIS COURT AND IN THE COURT OF
SPECIAL APPEALS TO BE PAID BY THE RESPON-
DENTS.