*Impac Mortgage Holdings, Inc. v. Curtis J. Timm, et al.*, No. 2119, September Term 2018. Opinion by Nazarian, J.

**BREACH OF CONTRACT – CONTRACT INTERPRETATION – OBJECTIVE VIEW – EFFECT GIVEN TO EACH CLAUSE**

Under objective view of contract interpretation, clause in Articles Supplementary governing the number of preferred shareholder votes required to amend the Articles was susceptible of only one meaning and was not ambiguous. Language requiring that the consent of at least two-thirds of one class of preferred shareholders—as opposed to two-thirds of both classes counted together—was required to amend the Articles. Other language in the same provision requiring that the class "vot[e] separately as a class with all series" of preferred shareholders did not create an ambiguity.

**RULE 2-602(A)(3) MOTION TO MODIFY SUMMARY JUDGMENT – MOTION TO STRIKE AMENDED COMPLAINT – NO ABUSE OF DISCRETION**

Circuit court did not abuse its discretion in denying plaintiffs' attempt to add a new count to complaint based on absence of evidence of shareholder consents. The plaintiffs had not alleged facts to support that theory of liability initially and plaintiffs' attempt to obtain discovery on that theory was based on speculation.

Circuit Court for Baltimore City
Case No. 24-C-11-008391

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2119

September Term, 2018

_____

IMPAC MORTGAGE HOLDINGS, INC.

v.

CURTIS J. TIMM, ET AL.

_____

Nazarian,
Reed,
Zarnoch, Robert A.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  April 1, 2020

\* Judge Steven Gould did not participate in the decision to report this opinion pursuant to Maryland Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

> Let's not be overconfident, we still have to count
> the votes.[1]

This complex litigation turns on the meaning of one complex sentence. That sentence defines the voting rights of two classes of preferred shareholders of Impac Mortgage Holdings, Inc. ("Impac"), a publicly traded real estate investment trust incorporated under the laws of Maryland and headquartered in Irvine, California. In 2004, Impac amended its charter with Articles Supplementary (the "Articles") that created "Series B" and "Series C" classes of preferred stock. Impac sold the shares for $25 per share in two public offerings that raised $161.7 million.

In 2009, after the real estate market tanked and the company hit hard times, Impac sought to buy back the Series B shares for approximately $0.29 per share and the Series C shares at approximately $0.28 per share. As a condition of buying back the stock, Impac also asked shareholders to agree to amend the Articles to, among other things, strip them of their right to collect dividends.

The vote was held (although some dispute this) and just over two-thirds of the Series B and Series C stockholders, collectively, tendered their stock. But the two-thirds threshold wasn't met for each class on its own—just under two-thirds of the Class B shareholders tendered their shares. The question, then, is whether the amendments were approved. Impac says they were, and it filed them with the United States Securities and Exchange

---

[1] Attributed to Harold Washington, Mayor of Chicago, 1983–87. *Mayoral Race One For The History Books; Will Turnout Be Headline or Footnote?* Chicago Sun-Times (Feb. 28, 2019), https://chicago.suntimes.com/2019/2/8/18368156/mayoral-race-one-for-history-books-will-turnout-be-headline-or-footnote.

Commission. But about two years later, Curtis Timm, a Series B and Series C preferred shareholder, says that the thresholds weren't met because Impac needed two-thirds of the shares in each class measured separately.

Mr. Timm filed a six-count class action complaint (the "Complaint") against Impac and individual members of its board of directors in the Circuit Court for Baltimore City. Three years later, Camac Fund LP ("Camac"), also a Series B and Series C preferred shareholder, intervened as a plaintiff. Over the course of several years and numerous sets of motions, the circuit court granted partial summary judgment in Mr. Timm's and Camac's favor on certain counts and in Impac's favor on others. In the course of reaching its decisions, the circuit court found the voting rights language ambiguous and, based on the available extrinsic evidence, found that two-thirds of the shares from each separate class had to tender their shares for the buyback and amendments to be approved. In July 2018, the court declared that the 2009 amendments to the Series B Articles were not valid, and that the 2004 Series B Articles remained in full force and effect. Among other things, it ordered injunctive relief requiring Impac to hold a special election for the Series B shareholders to elect two new directors under a provision in the 2004 Articles. The court rejected Mr. Timm and Camac's challenges to the validity of the Series C Articles amendments. Finally, it issued an order stating that it certified the decisions it had made to that point for immediate appeal under Rule 2-602(b). Impac appealed, Mr. Timm cross-appealed, and all of the parties agree with the circuit court that the voting rights provision is ambiguous. We find it unambiguous, hold that the unambiguous meaning leads to the same result, and affirm the judgment in all other respects.

2

## I.    BACKGROUND

To understand the issues in this case, we must first place them in context, which in turn requires us to walk through a lengthy procedural history.

### A.  The Claims

Mr. Timm filed the initial class action Complaint on December 7, 2011. On March 5, 2014, Camac filed its own intervenor complaint. The complaints are almost identical except that Camac's omits Mr. Timm's claim for relief in the form of punitive damages (Mr. Timm's Count V).

In Count I, Mr. Timm and Camac alleged that Impac breached the Series B Articles by amending them without the consent of two-thirds of Series B shareholders. They asserted that the voting rights provision in the Articles required a two-thirds vote of each class counted separately. That voting rights provision, section 6(d) of the Series B Articles,[2] is the complex sentence that lies at the heart of this case:

> So long as any shares of Series B Preferred Stock remain outstanding, the Corporation shall not, without the affirmative vote or consent of the holders of at least two-thirds of the shares of the Series B Preferred Stock outstanding at the time, given in person or by proxy, either in writing or at a meeting (voting separately as a class with all series of Parity Preferred that the Corporation may issue upon which like voting rights have been conferred and are exercisable), . . . (ii) amend, alter or repeal any of the provisions of the Charter . . . .

Impac never disputed that fewer than two-thirds of the Series B shareholders gave their consent to the amendments. It argued, however, that the voting rights provision is

_____

[2] The counterpart provision in the Series C Articles is identical except that it substitutes Series C for Series B in each relevant spot.

3

ambiguous and, in context, means that the Articles may be amended if two-thirds of the Series B and Series C shareholders, tallied together, tender their shares.

Count II also alleged a breach of the Articles, but a different breach. That count alleged that the Series B and Series C Articles hadn't been amended because the language and terms of the 2009 offering documents made the transaction impossible—it required Impac to purchase the shares *before* the shareholders' consents occurred or became effective. Count II went on to assert that because Maryland Code, § 2-509(b) of the Corporations and Associations Article prohibits corporations from voting shares of their own stock, there could have been no valid shareholder consent to the proposed amendments. This theory seems to posit that any consent by a preferred shareholder would not have been effective because it would have occurred when the shareholder no longer owned the stock, and any consent to amend by Impac would not have been valid because Impac was prohibited from voting its own shares.

Count III was titled "Breach of Fiduciary Duty/Violation of Good Faith and Fair Dealing" and contained several theories of liability, all grounded in the assertion that it was improper for Impac and the individual defendants to propose the Series B and Series C repurchase as they did—*i.e.*, as an offer to repurchase the stock at $0.28 and $0.29 per share, and on the condition that the shareholders agreed to amendments to the Articles that were against the shareholders' interests. The Complaint alleged at least four theories of impropriety:

- it characterized the 2009 tender offer and consent solicitation as a breach of contract for violation of the covenant of good faith and fair dealing;

4

- it characterized the 2009 tender offer and consent solicitation as an "illegal 'vote buying' scheme";

- it asserted that the individual board member defendants who were owners of Impac common stock had engaged in self-dealing; and

- it alleged that Impac and the individual defendants wrongfully coerced the shareholders into selling their stock and consenting to the amendments by "threat[ening]" them that if they did not do so, their stock would become worthless.

Count IV, Mr. Timm's Count V, and Mr. Timm's Count VI (Camac's Count V) do not allege separate causes of action, but instead seek remedies in the event the 2009 amendments to the Series B and/or Series C Articles are found invalid under any of the theories alleged in Counts I, II, or III. Count IV alleged that Impac breached section 3(d) of the Articles by purchasing Series B and Series C stock without paying the dividends owed for at least two quarters in 2009 before repurchasing it.[3] Count IV seeks an order requiring Impac to pay the dividends owed.

Count V of Mr. Timm's Complaint asserted that Impac and the individual defendants acted with "malice" and seeks punitive damages.

Count VI (Count V in Camac's complaint) seeks injunctive relief enforcing Section

---

[3] Section 3(d) of the 2004 Articles provides that Impac was not permitted to repurchase its common or preferred stock unless "full cumulative dividends" have been paid:

> [U]nless full cumulative dividends on the Series B Preferred Stock have been or contemporaneously are declared and paid or declared and a sum sufficient for the payment thereof is set apart for payment for all past dividend periods and the then current dividend period, . . . [no shares of] Common Stock, or any shares of preferred stock of the Corporation ranking junior to or on a parity with the Series B Preferred Stock . . . [shall] be redeemed, purchased or otherwise acquired for any consideration . . . by the Corporation. . . .

5

6(b) of the 2004 Series B and Series C Articles, which provides that if Impac fails to pay six or more quarterly dividends, a preferred shareholder may "immediately call for a special meeting to elect two directors to Impac's Board" with the consent of 20% of the Series B and Series C shareholders.[4]

**B. January 2013: The Circuit Court Grants Partial Summary Judgment In Favor Of Impac And The Individual Defendants.**

Impac filed a motion to dismiss Mr. Timm's Complaint on February 27, 2012. The circuit court held a hearing on June 28, 2012, and on January 29, 2013, entered a forty-page memorandum opinion and order deciding several of the claims in favor of Impac and the individual defendants. Because the parties relied on evidence outside of the Complaint, the circuit court treated the motion as a motion for summary judgment and granted judgment in favor of the individual defendants on all counts. As to Count I, the court denied Impac's motion to dismiss, and specifically held that the voting rights language in the Articles was ambiguous because it could mean *either* that the consent of two-thirds of Series B shareholders was required to amend the respective Articles Supplementary *or* that the consent of two-thirds of the Series B and Series C shareholders collectively was

---

[4] Section 6(b) of the 2004 Articles provides that, if Impac failed to pay dividends for six or more quarters (which here is undisputed), then the Series B shareholders may elect two board members:

> Whenever dividends on any shares of Series B Preferred stock . . . shall be in arrears for six or more quarterly periods . . . the holders of such shares . . . will be entitled to vote for the election of a total of two additional directors of the Corporation . . . at a special meeting called by the holders of record of at least 20% of the Series B Preferred Stock . . . .

required to amend either set of Articles. The court also found that the meaning of the language could not be determined without consideration of extrinsic evidence.

As for Count II, the court held that the underlying theory—*i.e.*, that the transaction was made impossible by the structure of the offer—was not supported by the language of the offering documents, and it granted judgment for Impac on that count.

The court also rejected the various theories of liability underlying Count III and granted judgment in Impac's favor on that count. *First*, the court dismissed the claim for breach of contract based on violation of the duty of good faith and fair dealing. *Second*, it held that the breach of fiduciary duty claim applies only to the individual defendants, not to Impac itself. *Third*, it also granted judgment in favor of the defendants on the breach of fiduciary duty claim because the allegations did not support "illegal vote buying" or impermissible coercion and because Mr. Timm had "abandoned any stand-alone self-dealing claim he may have alleged."

The court granted summary judgment in Impac's favor on Count V, Mr. Timm's claim for punitive damages, holding that the conclusory allegations that the defendants intended to injure Series B and Series C shareholders by stripping them of their economic rights were insufficient to state a claim and that they "simply seek, without a colorable basis in fact, to convert a garden variety breach of contract claim into a claim for punitive damages." And finally, the court denied Impac's motion to dismiss Counts IV and VI (Camac's Count V), the merits of which, it found, were tied to Count I's allegation that Impac did not amend the Articles validly.

On February 27, 2013, Mr. Timm filed a motion for reconsideration of the January

2013 order, and the court denied that motion in a fourteen-page memorandum opinion on December 6, 2013. Mr. Timm argued that the court's decisions on Count II and III improperly weighed facts, and the court rejected that argument. Mr. Timm argued that the circuit court erred in granting summary judgment for Impac on Count II because a genuine issue of material fact existed as to whether the depositary and transfer agent for the 2009 transaction (American Stock Transfer & Trust Co. ("AmStock" or the "Depositary")) delivered the shareholder consents to Impac before Impac accepted the shares for repurchase. The court rejected that argument too, noting that Mr. Timm had not alleged such a theory in his Complaint. Put another way, the court found that the Complaint's allegations as to the breach of the Articles in Count II were based, *not* on a question of fact, but instead on the theory that the court had rejected in the January 2013 opinion, *i.e.*, that the 2009 offering documents were flawed:

> [Mr. Timm] did not argue that the Depositary did not do something that was contemplated by the documents. It is apparent that [Mr. Timm's] theory was that the Depositary *could* not do what was necessary for the transaction to be effective, because what the instruments contemplated was impossible. That theory is based on the contents of the transaction documents themselves, not on the fact of whether the Depositary did or did not deliver the consents before Impac accepted the shares for purchase.

The court also rejected Mr. Timm's argument as to Count III that the court had weighed facts improperly in deciding to grant judgment for the individual defendants on the claim for breach of fiduciary duty based on impermissible coercion.

8

**C. Camac Intervenes, Discovery Proceeds, And The Court Again Addresses The Merits.**

On June 10, 2013, Camac, a Series B and Series C stockholder that acquired the stock after the 2009 amendments, moved to intervene as a plaintiff. Camac's motion to intervene was granted. On the same day, Impac moved for summary judgment on the remaining claims (Counts I, IV, and VI of Mr. Timm's Complaint and Counts I, IV, and V of Camac's Intervenor Complaint).

On May 5, 2014, Mr. Timm sought discovery from the Depositary, AmStock, by filing with the circuit court an "Application for Commission to the New York State Courts for the Issuance of a Subpoena *Duces Tecum*." The proposed subpoena sought information concerning AmStock's handling of shareholder consents.[5] Impac opposed the application

---

[5] The subpoena sought from AmStock deposition testimony on the following topics:

- information regarding instructions received from Impac or any of its agents regarding whether [AmStock] was alerted to the acceptance for purchase before it gave consent as discussed in more detail in Plaintiff's complaint . . . ;

- information regarding how votes were to be tallied for the above-mentioned redemption;

- information regarding what actions triggered consent for the above-mentioned redemption; and

- information regarding the votes required to approve amendments to the preferred stock.

- documents exchanged with Impac and any of its agents regarding the redemption sequence at issue in Plaintiff's complaint; how votes were to be tallied, and what actions triggered consent; and

- documents regarding the votes required to approve amendments to the preferred stock.

and moved for a protective order, arguing that the subpoena was aimed at collecting discovery on Count II, on which judgment had already been granted, and that the discovery was aimed at a theory not alleged in the Complaint and already rejected by the court. In other words, the circuit court already had precluded Mr. Timm from attempting to raise a dispute of fact about the sequence and timing of the shareholder consents and Impac's repurchase of the shares. The court agreed with Impac and entered an order on August 4, 2014 denying Mr. Timm's application for a subpoena and granting Impac's motion for protective order.

On February 27, 2015, Mr. Timm and Camac filed a motion for class certification. The circuit court has not yet ruled on that motion.

On March 9, 2015, Mr. Timm and Camac opposed Impac's February 28, 2014 motion for summary judgment and filed their own cross-motion for summary judgment on Count I. They argued, among other things, that the voting rights provision was unambiguous. They argued in the alternative that if the court found the language ambiguous, the extrinsic evidence weighed in favor of their interpretation. And finally, they argued that any remaining ambiguity should be construed against Impac as the "ultimate drafter" of the Articles, since the evidence demonstrated that they had been drafted by underwriters.

On April 1, 2015, Mr. Timm and Camac filed a Rule 2-602(a)(3) motion for revision of summary judgment as to Count II. They raised a version of the theory that Mr. Timm had raised earlier in his motion to reconsider the court's January 2013 ruling. Although Mr. Timm had been prevented from seeking discovery on that issue, some evidence

nevertheless had been produced during discovery that prompted him (and Camac) to attempt once again to revive the "no consents" theory: AmStock's affidavit, in response to a subpoena, stating that AmStock "had no involvement with the shareholder votes."[6] Mr. Timm and Camac also relied on the absence of evidence of any physical papers indicating the shareholders' consent and the deposition testimony of Impac's general counsel that he did not know where the written consents were located.

Mr. Timm and Camac seized on this new evidence to raise a number of overlapping—and at times difficult-to-follow—arguments in their Rule 2-602(a)(3) briefing. They contended that the January 2013 ruling had assumed erroneously that the 2009 tender offer and purchase had followed the documents, that the shareholders had transmitted their written, paper consents to the Depositary, and that the Depositary had either consented on their behalf or transmitted their consents to Impac. They argued, based on AmStock's affidavit, that its apparent lack of involvement in the consent transmittal process proved that the court had relied erroneously on the occurrence of a process that was not in fact followed.[7] Essentially, they argued that Mr. Timm had been "right for the

---

[6] Although the court had granted Impac's motion for protective order as to Mr. Timm's initial (broader) subpoena to AmStock, Mr. Timm and Camac later served a second (narrower) subpoena to which Impac did not object. As Impac represented in briefing before the circuit court, it did not object because the subpoena "was narrowly tailored in light of the Protective Order" and sought only communications between AmStock and Impac about the counting and processing of shareholder votes (a topic relevant to Count I).

[7] They specifically highlighted this language from the court's January 2013 memorandum opinion, which appeared to assume that the transaction took place in the manner described in the governing documents:

> The economic interest was necessarily delivered after the
> Depositary exercised the proxy because shareholder consent

wrong reasons" in alleging that there were "no" shareholder consents to authorize the amendments to the Series B and Series C Articles.[8] They also appeared to introduce a new theory of liability: that because the consents "didn't exist," Impac never could have received them, and therefore Impac's amendment of the Articles was improper.

Impac responded with evidence that the preferred stock had been held *electronically* (as opposed to in paper form) and, likewise, the consents and sales of the preferred stock in 2009 had occurred electronically, as the "book-entry" procedures in the governing documents contemplated. Impac did not produce evidence of electronic consents as such, but did submit AmStock's daily reports to Impac memorializing the 2009 electronic tender transactions. Impac also submitted a supplemental affidavit from AmStock's representative explaining that the phrase "had no involvement with the shareholder votes" in her initial affidavit meant that AmStock had not had direct communications with shareholders but that it nevertheless had fulfilled the role the 2009 offering documents required. Impac also pointed to the Maryland Uniform Electronic Transactions Act, Maryland Code (1975, 2013 Rep. Vol.), § 21-106 of the Commercial Law Article ("CL").

In reply, Mr. Timm and Camac did not dispute that the tenders and sales had occurred electronically, but argued instead that the Articles required consent either at a

---

and delivery thereof by the shareholders and Depositary were essentially conditions precedent to the transfer of the shares.

[8] They also suggested that Impac's statements in its SEC filings to the effect that it had received consents may constitute a "deliberate falsification" and indicated that, if the court were to grant its Rule 2-602(a)(3) motion, they would move to reinstate Count III and Mr. Timm's Count V; they implied as well that they would assert a fraud claim, although no fraud was ever alleged explicitly.

meeting or in writing and that the electronic voting procedures could not satisfy that requirement. They reasserted the theory that the court had previously rejected, that the structure of the 2009 transaction made impossible any valid shareholder consent *before* Impac's acquisition of the preferred shares. They continued to assert, at least implicitly, that the absence of evidence of shareholder consents in the record—either in paper or electronic form[9]—rendered Impac's amendment of the Articles improper. And they argued essentially that the Depositary did not fulfill its obligations:

> Since the Depositary disavows undertaking any act as attorney-in-fact or proxy in respect of the consent needed to enact the amendments, and since Impac has never been able to produce any written consents from the Depositary on behalf of any shareholders, the Court cannot reasonably conclude that Impac's tender offer and consent solicitation process resulted in the "vote or consent," "in writing," from the "Series B [Series C] Preferred Stock outstanding at the time," that the Articles Supplementary required."

(brackets in original).

On July 12, 2015, the court held a hearing on the cross-motions for summary judgment and the Rule 2-602(a)(3) motion for revision.

On March 28, 2016, Mr. Timm and Camac filed an Amendment of the Complaint by Interlineation that attempted to add a "Count VII" for breach of the Articles. That count asserted a claim based on the theories asserted in the Rule 2-602(a)(3) motion. Impac moved to strike the Amendment.

---

[9] The electronic, book-entry procedures included a requirement that consent be transmitted by "Agent's Messages." The parties did not cite, and we did not find, evidence of any Agent's Messages in the record.

On December 29, 2017, the circuit court entered a memorandum opinion and order that: (1) granted summary judgment in Mr. Timm and Camac's favor on Count I; (2) denied Mr. Timm and Camac's Rule 2-602(a)(3) motion for revision of summary judgment as to Count II; and (3) granted Impac's Motion to Strike Amended Complaint.

In February 2018, Mr. Timm filed a motion for reconsideration of the December 29, 2017 order, which the circuit court ultimately denied. He argued, among other things, that the court should reconsider summary judgment for Impac on Counts II, III, and V of his Complaint.[10] Mr. Timm also cited 18 U.S.C. § 1001[11] and argued that the court's finding that there had been "no written consents" supported his theory that the individual defendants made fraudulent representations in SEC filings saying that they had received the requisite number of consents to amend the Series B and Series C Articles.

In or about March 2018, at the court's direction, the parties submitted a series of briefs concerning the remaining issues, including appropriate remedies and whether the court should certify the rulings for immediate appeal under Rule 2-602(b).

On April 16, 2018, the court held a hearing, and on July 17, 2018, entered a memorandum opinion addressing the parties' supplemental briefing and a separate

---

[10] In their oppositions, Camac and Impac characterized Mr. Timm's motions as: (1) challenging the court's grant of summary judgment on Counts III and V; (2) challenging the court's grant of summary judgment on Count II to the extent he attempted to recharacterize Count III; (3) requesting a jury trial on the issue of damages; and (4) making several arguments regarding the pending class certification motion.

[11] 18 U.S.C. § 1001 is a federal criminal statute that prohibits false statements to the government and does not provide the basis for a civil cause of action. *Federal Sav. and Loan Ins. Corp. v. Reeves*, 816 F.2d 130, 138 (4th 1987).

"Judgment Order." The Judgment Order contained the following decisions:

- the court entered a declaratory judgment that "the purported amendments to the Series B Articles Supplementary filed in 2009 were not validly adopted because fewer than two-thirds of the series B shareholders consented" and that "the Series B Articles Supplementary adopted in 2004 remain in full force and effect" based on the court's grant of summary judgment as to Count I;

- the court entered judgment in favor of all of the individual defendants on all claims;

- the court entered judgment in favor of Impac on Counts II, III, and V of Mr. Timm's Complaint and on Counts II and III of Camac's complaint;

- the court entered a declaratory judgment that "Section 3(d) of the [2004] Articles Supplementary requires Impac to pay dividends on Series B shares for the first, second and third quarters of 2009", which was the relief requested in Count IV;[12] and

- the court ordered injunctive relief that required Impac "to hold a special election in accordance with section 6(b) of the [2004] Articles Supplementary" to elect two directors by the Series B shareholders, which was the relief requested in Count VI (of Mr. Timm's Complaint).[13]

The court explained that the "primary issue remaining for resolution is the identity of the persons entitled to dividends on Series B shares." Also outstanding are the questions of whether to certify a class of shareholders entitled to relief under the declaratory judgments and attorneys' fees.

Finally, the court entered an order stating that it certified all of its decisions for immediate appeal under Rule 2-602(b).

Impac filed a motion to stay the order to hold a special election pending appeal, which the court granted. Impac and Mr. Timm timely appealed, and then both cross-

---

[12] For the text of Section 3(d), *see* page 5, footnote 3, above.

[13] For the text of Section 6(b), *see* page 6, footnote 4, above.

appealed.

We supply additional facts as necessary below.

## II. DISCUSSION

Impac appeals the court's grant of summary judgment against it on Count I. It identifies two questions: *first*, the circuit court's consideration of extrinsic evidence in interpreting the language of the voting-rights provision, and *second*, the court's application of the canon of *contra proferentem*.[14] But we don't reach either because we decide, as a threshold matter, that the circuit court erred as a matter of law in finding the language of the voting-rights provision ambiguous. We find it unambiguous, and that its unambiguous meaning compelled summary judgment in favor of Mr. Timm and Camac on Count I.

---

[14] Impac identifies two Questions Presented in its appeal:

1. In granting summary judgment against Impac on interpretation of the voting-rights provision, did the circuit court err by weighing the extrinsic evidence, failing to accord Impac as the non-moving party the benefit of all inferences, and adopting an interpretation that does not give meaning to the "Parity Preferred" class voting language?

2. Did the circuit court err by applying *contra proferentem* against Impac as the drafter of the contract language, where a fact dispute existed as to whether Impac drafted the language?

Camac restates the Questions Presented in Impac's appeal as follows:

1. Did Impac fail to introduce material and admissible extrinsic evidence to demonstrate that a reasonable investor would understand the Voting Rights Provision to provide for collective voting?

2. Did the circuit court correctly apply *contra proferentem* against Impac, who drafted the ambiguous language at issue?

As best we can discern,[15] Mr. Timm appeals the circuit court's (1) summary

judgment in favor of Impac on Counts II, III, and V, (2) denial of his (and Camac's) Rule 2-

[15] In his appellate briefs, Mr. Timm states the Questions Presented in a prose form that appears to cover both the questions raised by Impac in its appeal and those raised by Mr. Timm in his cross-appeal. Mr. Timm's statements of the Questions Presented violate Maryland Rule 8-504(a)(3), which requires a brief to include "[a] statement of the questions presented, separately numbered, indicating the legal propositions involved and the questions of fact at issue expressed in the terms and circumstances of the case without unnecessary detail." Although we reach the merits of Mr. Timm's appeal as best as we can, parties risk dismissal of their appeal if they failed to follow the rules. Here are Mr. Timm's "Questions Presented":

> For the first five years, Impac paid their Preferred B Shareholders their quarterly dividends. After June 29, 2009, they changed the seven rights and provisions of the 2004 Form of Articles Supplementary for Series B. They stopped paying the dividends. They claimed the changes they made were legitimate and tried to deceive the shareholders into selling their shares for pennies while taking away their protective rights. We have proved that the illegal changes created are false and that there are no valid changes.

> The Appellant brief is about voting but the main issue is that there are no votes. The judgment in favor of the Plaintiffs should remain intact and the required annual dividends and other provisions restored.

He states these "Questions Presented" in his reply:

> Plaintiff [*i.e.*, Mr. Timm] explained the reasons why [the circuit court] should reverse [its] July 16, 2018 final rulings on Preferred C which hasn't changed since 2013. [It] granted Impac a summary judgment which eliminated Count II (Preferred C), Count III (Breach of Fiduciary Duty/Violation of Good Faith and Fair Dealing), and Count V (Punitive Damages) from the case. [] On January 28, 2013, [the circuit court] ordered that judgment in favor of Defendants on Tompkinson, Ashmore, Taylor, Morrison, Abrams, Walsh, Filipps and Peers on all claims asserted against them. In reversing these judgments, Impac should be accountable for their actions and the dividends in arrears should be paid immediately.

602(a)(3) motion concerning Count II, and (3) decision to grant Impac's motion to strike.[16] Mr. Timm's appellate briefing focuses primarily on the fact that the court effectively denied him an opportunity to assert his alternate theory of liability that there were "no" consents to amend either the Series B or Series C Articles Supplementary. We hold that the circuit court did not err in granting judgment in Impac's favor on Counts II and III or any of the other rulings that Mr. Timm challenges.

### A. Appellate Jurisdiction.

But before we reach the merits, we must first address whether we have jurisdiction to hear this interlocutory appeal. Ordinarily, a party's "right to seek appellate review of a trial court's ruling [] must await the entry of a final judgment that disposes of all claims against all parties . . . ." *Maryland State Bd. of Educ. v. Bradford*, 387 Md. 353, 382 (2005). "[T]here are only three exceptions to that rule: appeals from interlocutory orders specifically allowed by statute, predominantly those kinds of orders enumerated in Maryland Code, § 12-303 of the Cts. & Jud. Proc. Article; immediate appeals permitted under Maryland Rule 2-602(b); and appeals from interlocutory rulings allowed under the common law collateral order doctrine." *Id.* at 382–83. None of the parties questioned the circuit court's Rule 2-602(b) certification decision in their briefs or at argument, and the unusual pre-class certification posture of that decision led us, in the course of preparing

---

[16] Impac does not identify the circuit court's grant of its motion to strike Mr. Timm's complaint as being at issue on appeal. But we read Mr. Timm's brief as raising that issue because the Rule 2-602(a)(3) motion to revise judgment as to Count II and the attempt to amend the Complaint to add Count VII were both based on the same substantive argument, namely that that there was "no" evidence of shareholder consent to the amendments.

this opinion, to order supplemental briefing on that issue.

In that briefing, Impac and Camac argue that this case falls under two exceptions: an appeal of an order granting or dissolving an injunction under Maryland Code (2013 Repl. Vol.) § 12-303(3)(i) of the Courts and Judicial Proceedings Article ("CJ") and an intermediate appeal certified under Maryland Rule 2-602(b).

We hold that the circuit court's injunction compelling an election of new directors authorizes appellate jurisdiction under the second exception to the final judgment rule, *i.e.*, the statutory exception for granting injunctions under CJ § 12-303(3)(i). The Judgment Order affirmatively requires Impac to hold a special meeting to allow the Series B shareholders to elect two additional directors to Impac's Board of Directors, a right contained in Section 6(b) of the 2004 Articles and triggered by Impac's failure to pay certain Series B dividends. Not only does the injunctive relief fall within the statutory exception, the decision to order it depended on the circuit court determining that the 2009 Amendments to the Articles were valid, which in turn, required the resolution of questions of liability under Counts I, II, and III. In other words, the injunctive relief required the circuit court to interpret the voting rights provision (Count I), resolve the sequencing of the amendment transaction (Count II, original theory), resolve the "no consents" question (Count II, theory raised by Rule 2-602(b)(3) motion and Motion to Strike Amended Complaint); and resolve the other alleged grounds for invalidation of the 2009 amendments (Count III). And because those determinations were the basis for the injunctive relief, we have the authority to review them. *Bradford*, 387 Md. at 386–87; *USA Cartage Leasing, LLC v. Baer*, 202 Md. App. 138, 169 (2011), *aff'd* 429 Md. 199 (2012); *County*

19

*Commn's for Carroll Cty. v. Forty West Builders, Inc.*, 178 Md. App. 328, 373 (2008).

The circuit court acknowledged that CJ § 12-303(3)(i) authorizes judicial review of orders granting injunctive relief, but seemed concerned that that provision may not be enough because it went on to state that it certified its ruling for immediate appeal under Rule 2-602(b). That Rule allows an interlocutory appeal of an order "as to one or more but fewer than all" of the claims *or* "as to one or more but fewer than all" of the parties in cases where the court determines that there is "no just reason for delay":

> (b) If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:
>
> (1) as to one or more but fewer than all of the claims or parties.

For these purposes, a "claim" encompasses all legal theories and remedies that arise "from common operative facts," and isn't defined simply by the separate counts or legal theories listed in a complaint:

> A "claim" is defined as a "substantive cause of action" that encompasses all rights arising from common operative facts. Alternative legal theories and differing prayers for relief do not constitute separate "claims" so long as they arise from a single asserted legal right.

*Waterkeeper Alliance, Inc. v. Md. Dept. of Agriculture*, 439 Md. 262, 279 (2014) (cleaned up); *County Comm'rs for St. Mary's Cty. v. Lacer*, 393 Md. 415, 426 (2006) ("Our cases have made it clear that the disposition of an entire count or the ruling on a particular legal theory does not mean, in and of itself, that an entire 'claim' has been disposed of." (cleaned up)).

In this case, uncertainty remains about whether one or more but fewer than all claims

or parties have been resolved. That said, we need not resolve that question definitively because the Series B claim is reviewable under CJ § 12-303(3)(i).[17]

## B. Count I: The Voting Rights Provision is Unambiguous.

The first and main substantive issue on appeal is the meaning of Section 6(d) of the Articles, the provision defining the preferred shareholders' voting rights (we'll call it the "voting rights provision"). The circuit court granted summary judgment for Mr. Timm and Camac on Count I, in which they alleged that Impac breached the Series B Articles by

---

[17] In support of the Rule 2-602(b) certification, the circuit court relied on *Len Stoler, Inc. v. Wisner*, 223 Md. App. 218 (2015), a case on which Impac relies as well in its supplemental brief. The procedural posture of that case was similar to that here: the circuit court decided all issues relating to liability and relief as to the named plaintiffs, leaving class certification as the primary remaining issue. *Id.* at 228. Federal cases applying Fed. R. Civ. P. 54(b)—upon which Maryland Rule 2-602(b) was modeled—have also reached that conclusion on similar procedural postures. *See, e.g.*, *Pichler v. UNITE*, 542 F.3d 380, 385 n.6 (2008). In *Len Stoler*, this Court held that the requirements of Rule 2-602(b) had been met. Even so, we recognize some tension between *Len Stoler* and Court of Appeals jurisprudence holding that class certification is not a "claim" under Rule 2-602(b). *Snowden v. Balt. Gas & Elec. Co.*, 300 Md. 555 (1984). In *Snowden*, in contrast to the situation here and in *Len Stoler*, a party appealed the denial of a class certification motion, an attempt that the Court of Appeals rejected because the denial "was not dispositive with respect to an entire claim or party." *Id.* at 566. *See also Royal Fin. Servs., Inc. v. Eason*, 183 Md. App. 496, 499 (2008) (relying on *Snowden* and holding that grant of class certification motion, before resolution of any issues of liability, did not meet requirements of Rule 2-206(b) "because the class certification was not dispositive as to an entire claim or party.").

The notion that class certification is not a "claim" creates uncertainty in cases such as this and *Len Stoler* about whether claims could be certified under Rule 2-602(b) in advance of class certification. If class certification is not a "claim" under any circumstances, *and* all issues of liability and relief have been decided as to the named parties in a class certification case, then it is not clear that such a case would meet the technical requirements of Rule 2-602(b) that "one or more but fewer than all" claims have been decided. Indeed, "all" of the claims *would* have been decided, and with only collateral issues remaining. And the text of Rule 2-602(b) does not, on its face, allow for certification of an order when nothing but collateral issues remain. The injunction in this case, though, spares us that conundrum.

21

amending them without obtaining the consent of two-thirds of Series B shareholders. Whether Impac obtained the consent of the shareholders depends on how the Articles define the consent threshold, and that's where the parties disagree. Let's start, then, with the language itself, this time with emphases that highlight the operative portions:

> So long as any shares of Series B Preferred Stock remain outstanding, the Corporation shall not, *without the affirmative vote or consent of the holders of at least two-thirds of the shares of the Series B Preferred Stock outstanding at the time*, given in person or by proxy, either in writing or at a meeting (<u>voting separately as a class with all series of Parity Preferred that the Corporation may issue upon which like voting rights have been conferred and are exercisable</u>), . . . (ii) amend, alter or repeal any of the provisions of the Charter, so as to materially and adversely affect any preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications, or terms or conditions of redemption of the Series B Preferred Stock or the holders thereof . . . .

For the reasons we'll explain, we hold that the provision is unambiguous, that it requires a two-thirds vote of each class counted on its own to approve amendments to the Articles, and affirm the summary judgment in Mr. Timm's and Camac's favor on that ground.

When reviewing a summary judgment grant, we determine whether the trial court was legally correct. *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 694 (2015). The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law subject to *de novo* review. *Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7 (2014) (*citing Towson Univ. v. Conte*, 384 Md. 68, 78 (2004)); *Calomiris v. Woods*, 353 Md. 425, 434 (1999). And that is the standard here, since the rights of preferred stockholders are defined by contract (in this case the Articles). *See Scott v. B & O R.R. Co.*,

22

93 Md. 475, 497 (1901) (preferred stock "has about it no elements or rights other than those that are conferred upon it by the statute or contract to the authority of which it owes its existence"); *see also Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 600 (Del. 2008) (observing that the "rights of preferred shareholders are primarily contractual in nature").[18]

Maryland follows the objective law of contract interpretation, which "giv[es] effect to the clear terms of agreements, regardless of the intent of the parties at the time of contract formation." *Precision Small Engines, Inc. v. College Park*, 457 Md. 573, 585 (2018) (*quoting Myers v. Kayhoe*, 391 Md. 188, 198 (2006)). "[T]he true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Spacesaver*, 440 Md. at 8 (*quoting General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985)). "[T]he contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 52 (2013) (*quoting Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167 (1964)).

"Under the objective view, a written contract is ambiguous if, when read by a

---

[18] Maryland courts "frequently look [] to Delaware courts for guidance on issues of corporate law." *Oliveira v. Sugarman*, 451 Md. 208, 221 n.4 (2017).

reasonably prudent person, it is susceptible of more than one meaning." *Calomiris*, 353 Md. at 436 (citations omitted); *accord Dumbarton*, 434 Md. at 53 ("As with contracts generally, a covenant is ambiguous if its language is susceptible to multiple interpretations by a reasonable person."). "The determination of whether language is susceptible of more than one meaning includes a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *Calomiris*, 353 Md. at 436 (*quoting Pacific Indem. v. Interstate Fire & Cas.*, 302 Md. 383, 388 (1985)). Put another way, "while evidence of prior intentions and negotiations of the parties is inadmissible, the parol evidence rule would not bar a court from considering the context of the transaction or the custom of the trade in a determination of ambiguity." *Id.*

The circuit court found the voting rights provision ambiguous, so we start by reviewing the court's reasoning and decisions on ambiguity. Impac concedes that it did not obtain the consent of two-thirds of the Series B shareholders—it obtained the consent of 66.7% of the Series B and Series C shareholders tallied together, but only 66.2% of Series B shareholders when counted separately. When the issue was first raised before the circuit court, Impac argued that its failure to obtain the consent of two-thirds of Series B shareholders was not a breach of the voting rights provision because the provision did not require it. Instead, Impac argued, the provision is ambiguous, and, after considering extrinsic evidence, should be read to require the consent of two-thirds of the Series B and Series C shareholders counted together.

In its January 2013 memorandum opinion denying Impac's motion to dismiss, the circuit court viewed the voting rights provision as Impac did: it found the provision

ambiguous and concluded that its meaning could not be determined without considering extrinsic evidence. The court explained that the clause could be interpreted to mean either that the consent of two-thirds of Series B shareholders was required or that the consent of two-thirds of *all* preferred shareholders was required:

> To conclude that the provision in question is unambiguous, the court must conclude that the two-thirds requirement is susceptible of only one interpretation. Defendants urge a reading of section 6(d) under which the parenthetical class voting provision modifies the requirement for a minimum of two-thirds of the Preferred B shares. Under this reading, the Articles Supplementary could be understood to require a vote of two-thirds of the entire class. However, the language of section 6(d) can also be reasonably interpreted to require approval specifically by two-thirds of each class, regardless of the class voting requirement. Notwithstanding the class voting parenthetical, the language of section 6(d) also states that no amendment shall occur "without the affirmative vote or consent of the holders of at least two-thirds of the shares of the Series B Preferred Stock outstanding at the time." The specific requirement of two-thirds of the Preferred B shares precludes a conclusion, based on the words of the Articles Supplementary alone, that the language is unambiguous.

Discovery proceeded, and Impac sought summary judgment on Count I on February 28, 2014. Impac presented extrinsic evidence supporting its position that the parties intended that the voting rights provision mean that the affirmative consent or vote of two-thirds of *all* of the preferred shareholders, counted collectively, was required to amend either Series B or Series C Articles. In turn, Mr. Timm and Camac continued to maintain that the voting rights provision was unambiguous, and in the alternative, that the extrinsic evidence weighed in favor of interpreting the provision to mean that consent required a two-thirds vote of each series of shareholders counted separately. They argued as well that

any ambiguity remaining after consideration of extrinsic evidence should be construed against Impac, as the "ultimate drafter" of the Articles under the canon of *contra proferentem*.

In its December 2017 memorandum opinion, the circuit court held, consistent with its earlier decision, that the provision is ambiguous. The court explained that the conflict between the meanings of the first and second clauses of the provision created ambiguity about the votes needed to approve an amendment:

> [The provision] is ambiguous because of the conflict between the first clause and the later parenthetical. The first clause expressly requires the consent of two-thirds of the holders of Series B shares. Without the parenthetical the clause would be unambiguous because it could only be read to require the consent of two-thirds of the Series B shares. However, the parenthetical apparently qualifies the first phrase by stating that the Series B shares vote together with other party shares as a class. Impac's argument that the parenthetical means that the Voting Rights Provision should be read to require the consent of two-thirds of all parity shares requires the reader to substitute for the express language the understanding that it means two-thirds of all parity shares, not two-thirds of Series B shares.

The court rejected Mr. Timm and Camac's argument that the second clause concerned only the "mechanics of how the vote is conducted," *i.e.*, that the Series B and Series C shareholders were required to vote at the same time and place:

> Plaintiffs' argument that the Voting Rights Provision is unambiguous rests on the assertion that the parenthetical does not provide for a class vote of all parity shares but rather concerns the manner of voting. In this reading, the parenthetical merely describes the mechanics of how the vote is conducted, i.e., that the Series B shareholders would vote at the same place and time as other series. This argument is not compelling. While this reading expresses what is, perhaps, one

possible meaning, it fails to convince because it does not explain the time and place of voting, and the provision that the preferred stock vote separately as a class has no apparent significance as a mere regulation of voting procedure. Because plaintiffs do not convince the court that the provision is susceptible of only one meaning, the court rejects plaintiffs' argument that the provision is unambiguous.

The court considered the extrinsic evidence at length but found that it did not resolve the ambiguity, and ultimately resorted to the rule of construction that resolves ambiguities against the drafter of the contract, *contra proferentem. See Empire Fire and Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 116 Md. App. 143, 168 n.10 (1997). Although the Articles were drafted by Bear Stearns, the underwriter in the tender offer transaction, the court considered Impac to be the drafter for *contra proferentem* purposes because Impac had issued the preferred shares and, the court found, was responsible for the language of the Articles. The court then construed the language to mean that the consent of two-thirds of the Series B Preferred Stock was required to affect an amendment to the charter provisions for that class of stock.

We don't see the conflict between the first and second clauses. The written language of an agreement "govern[s] the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract" and the words in the contract "must be accorded their customary, ordinary, and accepted meaning." *Blackstone*, 442 Md. at 695 (quotations and citations omitted). The first clause—"the Corporation shall not, without the affirmative vote or consent of the holders of at least two-thirds of the shares of the Series B Preferred Stock outstanding at the time"—is not "susceptible of more than one meaning." *Calomiris*, 353 Md. at 436. It means that Impac can't take the actions that follow

27

without the vote or consent, to the extent there's a difference, of the Class B shareholders. The wording of the first clause, particularly the unambiguous requirement that Impac obtain "the affirmative vote or consent of the holders of at least two-thirds of the Series B Preferred Stock," precludes any conclusion that a vote garnering fewer than two-thirds of the Class B shares can succeed. The parties and the circuit court all seem to agree with this analysis as well.

The disagreement, and the alleged ambiguity, really arises in the second clause and its interaction with the first. On its face, the second clause—"voting separately as a class with all series of Parity Preferred"—means unambiguously that the Class B shareholders vote separately as a class with all of the other series of preferred stock. Yes, the parenthetical as a whole—"voting separately as a class with all series of Parity Preferred that the Corporation may issue upon which like voting rights have been conferred and are exercisable"—indicates that all of the classes will vote at the same time. But nothing in that language even purports to pool the Class B votes with the Class C votes, or anyone else's, in determining whether the class has consented to the amendments. If anything, the reference to the Class Bs "voting separately as a class" only bolsters the first clause in requiring a two-thirds vote of just the Class B shares. And to us, that ends the inquiry. Any other reading would "jettison[]" the substance of the provision. *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 397 (2019) (observing that "contract interpretation requires that effect be given to each clause to avoid an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed") (cleaned up).

28

Nevertheless, Impac argues, and the circuit court agreed, that the second clause's reference to voting "with all series of Parity Preferred" means, at least arguably, that the votes of all of the series voting at that time (in this instance, the Series B and Series C shareholders) must be counted together, and thus that a two-thirds vote of the shareholders tallied collectively yields consent. To us, the plain language is not susceptible to such a reading. The Articles certainly could have been drafted more artfully, but they mean what they say: Series B and C shareholders vote, by class, at the same time, and their votes on proposed amendments are counted separately. Each Series had its own set of Articles Supplementary. Each had a different dividend rate. Each was valued differently at the time of repurchase. The total number of shares for each class was different. Considering the plain language of the provision in context only reinforces our conclusion that it is not ambiguous. And as a result, there is no need to consider extrinsic evidence or alternative principles of construction: the unambiguous language of the voting rights provision required each class of preferred stock to vote separately, if at the same time as the other affected classes, and two-thirds of each class, counted separately, had to approve any amendments. We reach the same conclusion as the circuit court, albeit by a different path, and affirm its decision to grant summary judgment for Camac and Mr. Timm on Count I.

Impac argued, and points to lots of extrinsic evidence suggesting, that it was common practice to structure multiple classes of preferred stock with identical rights and obligations. The only real differences between the two classes here are the time of issue, the sale price, and the dividend rate. Impac would seem to have little to gain, and at least some control to lose, by allowing classes of preferred stock to make decisions individually.

29

But even if Impac and its professionals *intended* its classes of preferred stock to vote and act in lockstep, the unambiguous language of the Articles they prepared provides otherwise. There are sophisticated parties on both sides of this preferred stock relationship, and they are bound by the unambiguous terms of the documents memorializing that relationship. They had the ability and opportunity to create any preferred stock relationship they wanted within the bounds of the corporate and securities laws, and this is the relationship their documents created.

## C. The Circuit Court Did Not Err In Granting Summary Judgment In Impac's Favor On Count II.

Mr. Timm and Camac alleged in Count II that Impac had breached the Articles by amending them notwithstanding its failure, they claim, to obtain *any* consents or votes from the Series B or Series C stockholders. Mr. Timm and Camac offered two theories in support of that count. The *first*, as alleged in the Complaint, was the 2009 offer was flawed structurally because it had Impac repurchasing the shares *before* receiving shareholder consent. The court rejected that theory based on the language of the governing documents, and granted summary judgment in favor of Impac on that count in January 2013.

The *second* theory emerged after discovery and appeared first in Mr. Timm and Camac's motion to revise summary judgment under Rule 2-602(a)(3) and attempt to add another count based on the new theory. They asserted that the record lacked *any* evidence of the preferred shareholders' written, hard-copy consents, the existence of which the circuit court had assumed in its earlier rulings. They also asserted that a third party—the Depositary and transfer agent, AmStock—failed to fulfill its obligation to transmit

30

shareholder consents to Impac, and that because Impac never received the consents, its amendment of the Series B and Series C Articles breached the Articles' consent requirements.

In its December 2017 opinion, the circuit court denied Mr. Timm and Camac's Rule 2-602(b) motion to revise the court's earlier summary judgment ruling and likewise precluded them from adding a new claim. As best we can discern, Mr. Timm appeals all of the court's decisions relating to Count II, although he places the most emphasis on the second theory, *i.e.*, that Impac did not receive sufficient—and indeed any—consents from the preferred shareholders. We affirm the circuit court's decisions *in toto*.

*First*, with regard to Mr. Timm's challenge to the circuit court's January 2013 summary judgment decision in Impac's favor on Count II, there was no factual dispute, and so our task is to determine whether the trial court was correct as a matter of law. *Blackstone*, 442 Md. at 694. The following excerpt from Mr. Timm's opening appellate brief appears to be the full extent of his argument on appeal:

> 17. Redemption and Acquisition- Art. 5(f)
>
> To understand this case, you can't talk about Preferred B without talking about Preferred C because the same rules apply to both separate series created in 2004, on different dates. You must understand the section of the 2004 a "Preferred B" Form of Articles Supplementary labeled, (5) Redemption (f) *Status of Redeemed Shares.*
>
>> "Any shares of Series B Preferred Stock that shall at any time have been redeemed or otherwise acquired by the Corporation shall, after such redemption or acquisition, have the status of authorized but unissued preferred stock, without designation as to series until such shares are once more classified and designated as part of a particular series by the Board of Directors." []

31

> Under 5(f) status of redeemed shares in each of the Impac separate 2004 Forms of Articles Supplementary for "preferred B" stock or "Preferred C" stock, it is understood that once a Preferred share becomes a Treasury Stock or reacquired stock (a stock which was bought back by the issuing Company), **it becomes unissued and thus has no voting power**. Additionally, in the 2004 Form of Articles Supplementary of those same documents, there is no mention of a "Depositary" or a "Letter of Transmittal" and "Consent" []

> They never existed as part of these documents in regards to relinquishing your shares. Even if the shares remained issued and outstanding after Impac accepted them for purchase, they could not be voted under Maryland corporate law, which prohibits a corporation from directly or indirectly voting its own stock. []

(emphasis in original). That's it—Mr. Timm develops his argument no further and cites no case law to support it. His failure to present sufficient argument in his appellate brief means that Mr. Timm has waived his challenge to the court's summary judgment ruling, and we affirm the circuit court judgment on that ground. Md. Rule 8-504(a)(6) (requiring that an appellate brief contain "[a]rgument in support of the party's position"); *Klauenberg v. State*, 355 Md. 528, 552 (1999) ("[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal."); *Beck v. Mangels*, 100 Md. App. 144, 149 (1994). It is not our role to review a trial court's decision—which on this issue spans over ten pages—and issue-spot errors that the appellant hasn't identified.[19]

*Second* and *third*, we address Mr. Timm's other challenges to the denial of his (and Camac's) Rule 2-602(a)(3)[20] motion to revise judgment and the granting of Impac's motion

---

[19] Even if he had not waived this argument, we discern no error in the court's interpretation of the governing documents after reviewing its analysis and the documents themselves.

[20] Under Rule 2-602(a)(3), a circuit court has full revisory power over interlocutory orders:

to strike. We review those decisions for abuse of discretion. *See RCC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 673 (2010) (a trial court's denial of a motion to modify an interlocutory order reviewed for abuse of discretion); *Bacon v. Arey*, 203 Md. App. 606, 666 (2012) (a trial court's decision on a motion to strike is reviewed for abuse of discretion). An abuse of discretion occurs when a decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Spaw, LLC v. City of Annapolis*, 452 Md. 314, 363 (2017) (cleaned up).

Again, Mr. Timm's appellate briefing does not focus on the language of the documents governing the 2009 tender offer, but instead emphasizes the purported lack of evidence that shareholders consented to the amendments. He states in his Questions Presented that "the main issue is that there are no votes." He asserts that the shareholders "never agreed" to amend the Articles and again that "there are not any votes." He takes issue with the circuit court's "not check[ing] the **'facts' like asking to see the actual**

---

> Except as provided in section (b) of this Rule, an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:
>
> (1) is not a final judgment;
>
> (2) does not terminate the action as to any of the claims or any of the parties; and
>
> (3) *is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.*

(emphasis added).

**signed consents** and shareholder names, and verifying the voting percentage or anything else." (emphasis in original). He asserts that the circuit court "believed Impac allegedly received consents from the shareholders of Pfd. B Shares and Pfd. C Shares and received votes in excess of 66 2/3 [] even though **Impac didn't actually do this.**" (emphasis in original). He raises the Depositary's initial testimony that it was not involved in shareholder consents and asserts that the "Letters of Transmittal were never signed by the Depositary or Impac or anyone else because they didn't exist." And he cites the deposition testimony of Impac's general counsel to the effect that that counsel did not know where the consents were. Finally, he challenges the electronic "book-entry" consent procedure by asserting that, just as there is no evidence of hand-signed consents in the record, there is no evidence of "Agent's Messages" in the record, which were required as part of the electronic consent procedures.

As before, Mr. Timm's legal arguments are far from fully developed. But as best we can discern, he claims that the circuit court erred in precluding him from bringing a claim grounded in the absence of evidence of shareholder consents, either handwritten or electronic. Over the course of fifteen pages in its December 2017 memorandum opinion, the circuit court considered and rejected Mr. Timm's (and Camac's) effort to raise their new "no consents" theory of liability. The circuit court identified the following arguments, which parallel the ones Mr. Timm raises here:

> The affidavit of [AmStock] establishes that the Depositary performed no function because the affidavit states that AmStock had no involvement with shareholder votes.
>
> The deposition testimony of [Impac's general counsel]

34

> establishes that the transaction did not occur because [Impac's general counsel] stated that he did not know the location of any written consents.
>
> The court's grant of partial summary judgment was based on the understanding that written consents were executed by preferred shareholders and that written consent to the amendments was made by the Depositary. However, neither occurred because there were no written consents from either.
>
> The electronic voting procedures do not establish consent by the shareholders to the amendments. A variety of arguments are included with this contention. Plaintiffs assert that the Articles Supplementary require a vote or consent at a meeting, and the electronic voting procedures do not comply with this requirement. They also question certain aspects of the electronic voting process.

None of these arguments—which the circuit court addressed carefully and systematically—convinces us that the court abused its discretion in denying his motion to modify the summary judgment ruling as to Count II. As an initial matter, Impac does not dispute the absence of paper shareholder consents or the electronic "Agent's Messages." But Impac did receive daily reports from AmStock identifying the numbers of electronic tenders it had received. And the absence of evidence beyond these reports doesn't compel us to find that the circuit court abused its discretion in declining to allow Mr. Timm and Camac to pursue their alternate "no consents" theory of liability. Whether or not consents were transmitted to Impac was not at issue in the case. Discovery was never developed nor pursued on that question—indeed, the circuit court entered a protective order precluding such discovery on the ground that it was a fishing expedition. The issue was injected into the case at a later stage by the Depositary's vague response to a subpoena that it was "not involved" with shareholder votes. And after giving due consideration to the parties'

positions, the circuit court found that neither revising summary judgment on Count II nor allowing amendment of the Complaint was warranted.

The circuit court explained its reasoning fully, and found "disingenuous" any implication that Impac had failed to establish its case by not producing the actual consents:

> Plaintiffs also argue that the grant of summary judgment should be revisited because of the lack of actual evidence in the record concerning some features of the operation of the transaction. Specifically, plaintiffs argue that if Impac received Agents' Messages they are not in the record. The court previously rejected plaintiff Timm's argument that the complaint actually alleged that the transaction did not occur as provided for by the documents. The court also rejected his attempt to undertake discovery in order to search for evidence to support a claim that had not been alleged in the Complaint. The argument that the absence of Agents' Messages in the record is fatal to Impac's contention is the equivalent of the argument previously made that plaintiffs should be entitled to take discovery in order to assess whether or not a cause of action exists. The court again rejects plaintiffs' proposal that discovery should be employed to ascertain whether or not plaintiffs have a cause of action.[]
>
> **Plaintiffs' argument that if Impac had received the required number of timely delivered written consent[s] it would have moved for summary judgment on that basis is disingenuous**. As stated many times, plaintiff never alleged in the complaint that Impac had not received the required number of written consents, and there was no reason for Impac to move for summary judgment on that basis. **Again, this is an attempt to assert a new cause of action based on hypothetical assertions of fact.**

(emphasis added).

The circuit court also addressed the absence of evidence that the Depositary transmitted the consents to Impac. Between arguing that the Depositary failed to transmit the consents and claiming that the Depositary itself failed to consent on behalf of the

shareholders, Mr. Timm and Camac argued that Impac breached the Articles by amending them without having *received* the consents from either the shareholders or from the Depositary. But while the governing documents appeared to have authorized the Depositary to consent on behalf of the shareholders, there was no requirement that the Depositary itself consent. The circuit court suggested that the latter was the case in its January 2013 opinion, but clarified this issue as follows in its December 2017 opinion: "To the extent that the court held that the Depositary was required to consent, there does not appear to be any reason in the transaction that the Depositary's consent would be essential." We find no abuse of discretion in that conclusion.

*Finally*, the circuit court also addressed Mr. Timm's (and Camac's) challenges to the validity of the electronic consent procedures. As an initial matter, the court acknowledged that its January 2013 memorandum opinion and the associated briefing assumed that consents were transmitted via handwritten papers and that it appeared instead that the consents were transmitted by the book-entry procedures. But it concluded that the *means* of the consent transmittal did not affect its ultimate conclusion that the original theory of liability under Count II for breach of the Articles was not borne out by language of the governing documents, and additionally observed that the plaintiffs, being shareholders, presumably knew that they held their shares in electronic, as opposed to paper, form:

> Plaintiffs correctly observe that all of the language in the opinion granting summary judgment on Count II (which they quote at length), as well as defendant's argument (which they also quote at length) spoke about the return of written consents in terms of the Letter of Transmittal. Plaintiffs interpret

Impac's arguments as false in the light of the realization that consents were delivered by means of a book-entry electronic voting procedure instead of the return of physical Letters of Transmittal and Consent. The court does not view this retrojection as undermining the veracity of the argument that was made by Impac. Those arguments must be read in the context of the issues that were before the court upon the Motion to Dismiss. Plaintiffs' attack upon the transaction at that time focused upon the provisions of the transaction documents dealing with Letters of Transmittal and Consent. Given that context, the fact that Impac's arguments responded in kind does not establish an intent to hoodwink the court nor that they were inaccurate. For the reasons state below, the court believes that the provisions of the documents relating to electronic voting incorporate the provisions of the Letter of Transmittal and Consent. **Therefore the court's conclusions rejecting plaintiffs' arguments that the design of the transaction was fatally flawed apply with equal force notwithstanding the fact that physical Letters of Transmittal and Consent were not returned**. If the court's conclusions are read in light of this fact, they are equally valid as in their original expression.

At the time, apparently no one focused on the fact that shareholders who held their shares in book-entry form would not be using the physical Letter of Transmittal. However, that fact was plainly apparent from the contents of the Letter of Transmittal and the Offering Circular themselves. **Furthermore, it appears from the Moisio affidavit, as well as the Prospectus Supplements from the original issues, that all of the preferred stock was held in book-entry form.**[21] **Impac's argument was phrased in the way that it was because the allegations of the complaint focused on the terms of the Letters of Transmittal. Accordingly, the fact that there were no written consents in the form of executed Letters of Transmittal does not by itself affect the court's ruling**.

(emphasis added).

---

[21] **Presumably that fact was known by plaintiffs as shareholders.** (emphasis added; footnote from original).

The court went on to conclude that the governing documents made clear to shareholders that, if they tendered their consents through the book-entry procedures, then that tender would indicate their consent, and an Agent's Message would take the place of a paper consent. The court cited CL § 21-106, which provides in part that "[a] record . . . may not be denied legal effect or enforceability solely because it is in electronic form," and concluded that electronic consents satisfied any "writing" requirement. After reviewing the governing documents, we find no abuse of discretion in the court's conclusion that "shareholders who submitted tenders electronically did so with the understanding that the Letters of Transmittal specified that their tender constituted consent."

Although the procedural history behind the "no consents" issue is lengthy and complex, the issue to be decided is relatively simple: Did the court abuse its discretion in effectively precluding Mr. Timm from pursuing that theory? We are mindful that a trial court abuses its discretion when "no reasonable person would take [its] view" or when its ruling is "violative of fact and logic." *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997) (cleaned up). And reviewing the "no consents" issue in depth, we find no abuse of discretion in the court's denial of the Rule 2-602(a)(3) motion to amend summary judgment as to Count II.

We make the same finding with respect to Mr. Timm's attempt to amend the Complaint to add that theory. We so hold, recognizing that "leave to amend complaints should be granted freely to serve the ends of justice and [] it is the rare situation in which a court should not grant leave to amend . . . ." *RCC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 673 (2010) (*citing Hall v. Barlow Corp.*, 255 Md. 28, 40–41 (1969)). But "an

amendment should not be allowed if it would result in prejudice to the opposing party or undue delay, such as where amendment would be futile because the claim is flawed irreparably." *Id.* at 673–74 (*citing Robertson v. Davis*, 271 Md. 708, 710 (1974)). And in this case, the court did not abuse its discretion in disallowing Mr. Timm (and Camac) from amending the Complaint to pursue a theory prompted by a vague statement in an affidavit—which was later clarified—in response to discovery requests propounded with respect to a separate claim. Moreover, the information that did come to light concerning the electronic consent procedures strongly suggests that there was and is no reason to believe that Impac received "no" consents from shareholders.

### D. The Circuit Court Did Not Err In Granting Summary Judgment In Impac's Favor On Count III.

In Count III, Mr. Timm alleged several theories of liability, including breach of contract based on the violation of the covenant of good faith and fair dealing, breach of fiduciary duty, "illegal vote buying," and "coercion." All theories were based on the global assertion that Impac's 2009 tender offer was—by its very nature—illegal. The circuit court granted summary judgment on Count III in January 2013, and Mr. Timm appeals.

Mr. Timm's opening appellate brief does not cite any case law or develop any legal argument concerning the legal theories underlying Count III that he asserted in the Complaint and that the circuit court addressed in depth in its January 2013 memorandum opinion. His reply brief mentions the legal theories, but cites no case law and develops no legal argument as to the grounds upon which the circuit court erred in granting summary judgment in Impac's favor on Count III. Accordingly, we find that Mr. Timm has waived

40

his challenge to the court's grant of judgment on Count III for failure to offer sufficient argument. Md. Rule 8-504(a)(6); *Klauenberg*, 355 Md. at 551–52; *Beck*, 100 Md. App. at 149. Again, it is not our task to identify errors where the appellant has not.

### E. The Other Issues That Mr. Timm Raises Are Without Merit.

Mr. Timm raises a number of other issues, none of which have merit.

*First*, Mr. Timm claimed punitive damages in Count V, and on appeal he challenges the circuit court's grant of summary judgment in Impac's favor on that count. As an initial matter, a claim for punitive damages is not a standalone cause of action. It is part of a prayer for relief. But Mr. Timm is not entitled to punitive damages in any event because they are not available as a form of relief for breach of contract. *George Wasserman & Janice Wasserman Goldstein Family LLC v. Kay*, 197 Md. App. 586, 636 (2011) (*citing Sims v. Ryland Group, Inc.*, 37 Md. App. 470 (1977)). Mr. Timm argues that punitive damages "are permitted in a tort action arising from a breach of contract where the plaintiff demonstrates actual malice by the defendant." But Mr. Timm alleges no tort claim. The circuit court did not err in granting judgment on Count V.

*Second*, Mr. Timm's appellate briefing contains various assertions of fraud by Impac and the individual defendants, including that Impac made false statements in filings with the SEC to the effect that Impac had received the requisite consent to amend the Articles. Mr. Timm also maintained that Impac's general counsel, Mr. Morrison, violated 18 U.S.C. § 1001 in making these false statements, and asserted that Mr. Morrison "could have been fined or spent up to five years in prison before the statute of limitations expired in that five year window of time." Mr. Timm did not explicitly allege any color of a fraud

41

as an underlying theory of liability in the operative Complaint. Impac characterizes the fraud assertions as an attempt to reassert Count III, which contained allegations of "illegal vote buying." But we address these assertions only to say that we discern no question that is properly before us. Put another way, fraud is simply not at issue in this case and therefore is not an issue upon which we may render a decision.

*Third*, Mr. Timm requests an award of attorneys' fees. Attorneys' fees were neither decided nor certified for appeal by the circuit court—indeed, the circuit court explicitly identified attorneys' fees as an issue that would remain to be decided after this appeal— and we will likewise not consider that question.

*Fourth*, and finally, Mr. Timm asserts that, because the 2004 Series B Articles Supplementary remain in effect, Impac owes him and other Series B shareholders dividends on all quarters since 2009.[22] This, too, is a question not yet decided by the circuit court, if it even has been raised, and there is no decision for us to review.[23]

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT AND CROSS-APPELLANT TO SPLIT COSTS.**

---

[22] Mr. Timm advances this argument with respect to Series C shares as well, but that argument fails at the threshold because we have affirmed the circuit court's grant of summary judgment on Counts II and III.

[23] The circuit court did not expressly identify the question of whether damages in the form of dividend payments after 2009 would be owed as part of Count I as an outstanding issue in its July 2018 memorandum opinion. Impac does not address this question in its appellate briefing, and we did not find anywhere in the record where this question was either addressed or decided.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/2119s18cn.pdf